**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY**

| | | |
|---|---|---|
| **BEAU CHARBONNEAU,** | ) | |
| **On behalf of himself and others similarly** | ) | |
| **situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18-cv-02062-CM-ADM** |
| | ) | |
| **MORTGAGE LENDERS OF AMERICA,** | ) | |
| **L.L.C., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Mortgage Lenders of America, L.L.C. ("MLOA"), Phillip Kniebert, and Brad Ives (collectively, "Defendants") are entitled to summary judgment as to each of Plaintiff Beau Charbonneau's individual claims arising under Kansas state law. Plaintiff's claims for wages under the Kansas Wage Payment Act (Count III), are preempted in their entirety by the Fair Labor Standards Act. Plaintiff's Kansas Wage Payment Act claims under Count IV fail as a matter of law because Plaintiff did not earn the payments he seeks to recover. Also, the Court should grant Defendants' summary judgment on Counts VI and VII, which allege breach of contract, because he cannot make a *prima facie* showing that any act by Defendants was a breach of the parties' contracts.

## I.     Statement of Facts

1.     Plaintiff Beau Charbonneau ("Plaintiff") is a former employee of MLOA. *See* Doc. 94 at ¶ 14.

2.      During the course of his employment with MLOA, Plaintiff signed Loan Officer Agreements detailing the terms and conditions of his employment, including his compensation. Ex. 1, MLOA 040667-70; Ex. 2, Charbonneau Dep. 35:10-22.

3.      For example, on January 8, 2008, Plaintiff signed the Originator Compensation Agreement. Section 2 of that Agreement regarding "Compensation," provides:

> The commission earned on funded loans shall be based on the schedule outlined in Exhibit 'A.' Originator understands that the Daily Price Sheet shall be modified form time to time by MLOA or the applicable investor in its sole discretion. All compensation shall be subject to standard withholding requirements . . . Commission shall be payable monthly on the 15th of the month for loans that funded during the previous month. See exhibit "A" for more details.

Ex. 1, MLOA 040667.

4.      Section 3.1 of Originator Compensation Agreement states in relevant part:

> Commissions shall be paid after the deduction of any amounts due MLOA and deductions for any unreturned company equipment. No commissions shall be paid on any loans, which fund after termination. This paragraph may be amended on a case-by-case written agreement between MLOA and Originator.

Ex. 1, MLOA 040667.

5.      Exhibit A to the Originator Compensation Agreement described how Plaintiff's Commission compensations were calculated, showing an example of how Plaintiff's commission pay was calculated and provides "[Defendant] shall make adjustments in the process of calculating Commission Compensation for . . . uncollected fees, [and] costs for uncollected credit reports . . . Commission Compensation is not earned until all deductions are made for [these fees]". Ex. 1, MLOA 040670.

**Plaintiff's Team Lead Compensation**

6.      In August 2013, Plaintiff was promoted to a Team Lead position. Ex. 3, MLOA 040641. In February 2016, Plaintiff's job title changed to Loan Origination Manager, though his

position was still generally referred to as the Team Lead or Team Leader. Plaintiff held the position of Team Lead/Loan Origination Manager until August 1, 2016. Doc. 94 at ¶ 14.

7.      As a Team Lead/Loan Origination Manager, Plaintiff's primary job duties were to: recruit successful loan officers, train and manage a team of Loan Officers, as well as selling loans. Ex. 2, Charbonneau Dep. 29:6-20; 49:15-50:17; Ex. 4, Rockers Nelson Dep. at 12:2-13.

8.      During the time Plaintiff held the Team Lead/Loan Origination Manager position, he received the following monthly pay: $175 per Loan Officer on his team; a 4% commission of all loans funded by Loan Officers who reported to him; and a commission of loans Plaintiff originated and funded. Ex. 2, Charbonneau Dep. at 20:5-21:11; Ex. 5, Loan Originator Manager Compensation Schedule at MLOA 040676-79.

9.      His compensation was detailed in Exhibit A: Loan Originator Manager Compensation Schedule, which he signed. Ex. 5, MLOA 040676-79.

10.     The "Time of Calculation and Payment of Commissions" Section to Exhibit A: Loan Originator Manager Compensation Schedule provides:

> Commissions (to the extent earned pursuant to the calculations set forth below and subject to applicable adjustments) shall be payable monthly on the fifteenth (15th) of the month for loans that fund during the previous month. Loans shall be considered funded when loan proceeds are disbursed at a loan closing and all applicable loan documents are in the possession of MLOA and have been duly executed. See also the Commission Conditions set forth below concerning the time that commissions are earned.

*Id.* at MLOA 040676.

11.     The "Required Lender Fees" Section to Exhibit A: Loan Originator Manager Compensation Schedule states: "Manager is required to collect lender fees in advance from borrowers on each loan in accordance with MLOA policies as adopted, pronounced or changed from time to time." *Id.* at MLOA 040677.

12.    The "Credit Report Budget" Section to Exhibit A Loan Originator Manager Compensation Schedule states: "MLOA may, in its discretion, contribute the amount(s) toward the total costs associated with credit reports ordered by Manager. The amount so contributed by MLOA, subject to adjustment in MLOA's discretion, and may differ depending on various factors, including, without limitation, Manager's GCI in prior periods." *Id.*

13.    The "Early Pay-Offs and Early Payment Defaults" Section of Exhibit A: Loan Originator Manager Compensation Schedule states: "Early Pay-offs (EPO) and Early Payment Defaults (EPD) occur when a loan file is either paid-in-full (paid off) early or if the borrowers fail to comply with the terms of loan documents during the early term of the loan." *Id.*

14.    Exhibit A: Loan Originator Manager Compensation Schedule also provides a section for the "Formula for Calculating Commissions:"

> To calculate the Commission Compensation, MLOA will first total GCI assigned to all loans originated by Manager for which Manager is entitled to a commission that funded during the preceding month ("Total GCI"). Percentages will then be applied to the Total GCI . . .
>
> The "GCI Payout" will be equal to Total GCI multiplied by the applicable percentages . . . The amount of Commission Compensation paid to Manager will be equal to the GCI Payout **after deductions** for the amount of the Hourly Wage, **shortages for uncollected fees, uncollected costs for credit reports, and any commissions previously advanced for EPOs and EPDs.** See also the Commission Conditions set forth below concerning the time that commissions are earned.

*Id.* at MLOA 040677-78 (emphasis added).

15.    The "Commission Conditions" section of Exhibit A: Loan Originator Manager Compensation Schedule specifies:

> **MLOA shall make adjustments in the process of calculating Commission Compensation for Hourly Wage, shortages for uncollected fees, costs for uncollected credit reports and commissions paid to Manager on EPOs or EPDs.**

Commission Compensation is not earned until the EPO or EPD on each loan included in the Total GCI has expired and MLOA has determined there is no EPO or EPD as to each such loan. The amount of Commission Compensation paid on any loan that results in an EPO or EPD shall not be considered earned commission and will be charged back against future GCI Payouts.

**Commission Compensation is not earned until all deductions are made for Hourly Wage, shortages for uncollected fees, and uncollected costs for credit reports**, pursuant to the formula for calculating commissions.

*Id.* at MLOA 040678 (emphasis added).

16.     Team Leads were compensated consistent with this agreement. Ex. 6, Kneibert Dep. at 240:24-241:11.

**Plaintiff's Loan Officer Compensation**

17.     On August 1, 2016, Plaintiff was demoted to the position of Loan Officer. Plaintiff held that position until his termination from MLOA's employment on November 10, 2017. See Doc. 94 at ¶ 14.

18.     Because Loan Officers are hourly employees, Plaintiff's compensation changed at the time of his demotion. After moving into the Loan Officer position in August 2016, Plaintiff signed Exhibit A: Loan Officer Compensation Schedule. Ex. 7, MLOA 041847-041850.

19.     Under this Agreement, Loan Officers were paid entirely on commissions, but they received an hourly wage equivalent to the federal minimum wage as a draw against those commissions:

MLOA shall pay Officer a**n hourly wage equal to the then-existing minimum wage, as set forth under applicable Federal and state law**, for each hour Officer performs work for MLOA, subject to the standard withholding requirements such as federal, state and local income tax, social security and medical contributions ("Hourly Wage"). **The Hourly Wage is considered an advance against future commission payments paid to Officer. Future commission payments will be reduced by the amount of the advance.** However, Officer shall not be paid less each month than the amount of Hourly Wage, regardless of the amount of Commission Compensation, as calculated under the section on Commission Compensation below. . .

Officer will be paid the hourly wage twice monthly, on the fifteenth (15th) and last day of the month, pursuant to MLOA's standard payroll practices. Officer will be eligible for overtime pay in accordance with the applicable law. The amount of overtime pay will not be deducted from the amount of commission payments. Officer is required to obtain written permission from Officer's Loan Originator manager, also known as the Team Lead or Team Leader, in advance before overtime work is performed. Unauthorized overtime work may subject Officer to verbal or written warning and/or disciplinary action, up to and including termination.

**Officer is required to use the MLOA time clock system to record Officer's hours worked. Officer shall notify Officer's Loan Originator manager as soon as possible, if Officer misses or incorrectly records an entry into the time keeping system**. MLOA has the right to adjust the time clock record to accurately report the time Officer worked.

Ex. 8 at MLOA 040681 (emphasis added).

20.     The remaining terms regarding calculation of commission are virtually identical to those that governed Plaintiff's commission calculation during his time as a Team Leader. Ex. 8, MLOA 040681-040684.

21.     In particular, the "Commissions Condition" section to Exhibit A: Loan Officer Compensation Schedule states:

**MLOA shall make adjustments in the process of calculating Commission Compensation for Hourly wage, shortages for uncollected fees, costs for uncollected credit reports and commissions paid to Officer on EPOs or EPDs.**

**Commission Compensation is not earned until the EPO or EPD on each loan included in the Total GCI has expired and MLOA has determined there is no EPO or EPD as to each such loan.** The amount of Commission Compensation paid on any loan that results in an EPO or EPD **shall not be considered earned commission** and will be charged back against future GCI Payouts.

**Commission Compensation is not earned until all deductions are made for Hourly Wage, shortages for uncollected fees, and uncollected costs for credit reports**, pursuant to the formula for calculating commissions.

Ex. 8 at MLOA 040684. *See also* Ex. 6, Kneibert Dep. at 285:24-286:24.

22.     Plaintiff knew how the commission plan worked. Ex. 2, Charbonneau Dep. at 34:24-35:3.

23.     He does not think anyone at MLOA ever told him the terms of the Compensation Schedule would *not* control how his commission was calculated. Ex. 2, Charbonneau Dep. at 41:25-42:3.

24.     During the 15 months Plaintiff Charbonneau was a Loan Officer between August 2016 and November 2017, he received between $9,764.81 and $35,000 per month in commissions. Ex. 9, Miller Dec. at ¶ 6. During this time period, Plaintiff Charbonneau's commission earnings totaled $336,116.66. *Id.*

25.     Plaintiff's lowest monthly commission payment during this time period was $9,764.81 in April of 2017. *Id.*

**Plaintiff's Time Record Adjustments**

26.     Throughout Plaintiff's employment with MLOA and through the present day, MLOA has utilized a timekeeping system for the tracking, recording, and reporting of hours worked by Loan Officers and its other hourly, non-exempt employees. Ex. 10, Defendant MLOA Supplemental Answer to Interrogatories, Answer to Interrogatory No. 3.

27.     In addition to the agreements signed by Plaintiff and MLOA stating that Loan Officers were required to use MLOA's time clock system, MLOA expected Plaintiff (and other Loan Officers) to log their time correctly. Ex. 6, Kneibert Dep. at 115:1-116:21.

28.     Prior to early 2017, the supervisors of hourly, non-exempt employees were authorized to edit or make adjustments to time entries for the employees they supervised to correct missed punches or other similar issues. Beginning in early 2017, MLOA changed its time entry adjustment practices such that all time entry adjustments had to be requested and then

approved by MLOA's Human Resources group. Ex. 10, Supplemental Answers to Interrogatories, Answer to Interrogatory No. 3.

29.     Plaintiff was familiar with this process of adjusting his time records, and provided information to adjust his time records accordingly several times throughout his time as a Loan Officer in 2016 and 2017.  Ex. 2, Charbonneau Dep. at 95:17-24, 101:19-106:13.

30.     For example, on September 28, 2016, Plaintiff sent an email to Amanda Strickland at MLOA stating he had performed work at home from 8:11-9:05.personnel about recording his arrival times on four different dates. Ex. at MLOA 664923; *see* Ex. 2, Charbonneau Dep. at 104:17-110:7.

31.     In January 2017, Plaintiff sent emails to MLOA on January 7 and 14 regarding adjustments to his time records, including adjustments made to reflect time he worked at home. Ex. 11 (Charbonneau Deposition Exhibit 17) at MLOA 475519-20.

32.     In February 2017, Plaintiff similarly sent emails to MLOA personnel on February 3, 13 and 27 regarding adjustments to his time records, including adjustments made to reflect time he worked at home. *Id.* at MLOA 475522, 046426, 672189-90.

33.     In March 2017, Plaintiff again sent an email to MLOA personnel on March 13, 14 and 15 regarding adjustments to this time records including adjustments made to reflect time he worked at home. *Id.* at MLOA 475511, 475531-32, 046447.

34.     Similarly, on May 26, 2017, Plaintiff emailed Team Lead Mike Klema regarding adjustments to his time records to reflect time he worked from home earlier that week. *Id.* at MLOA 674083-84.

35.     MLOA Human Resources personnel also reached out to Plaintiff several times to ask if he needed adjustments to his time records. Ex. 2, Charbonneau Dep. at 136:16-138:5;

Exhibits 12 and 13 (emails between Charbonneau and HR, Charbonneau Deposition Exhibits 15 and 16).

36.     From February 5, 2013 through the present, the time entries of Loan Officers, including Plaintiff, have been reviewed for accuracy by the Loan Officers themselves and by their supervisors, and for compliance with MLOA's policies and applicable law by MLOA's Human Resources personnel. Ex. 2, Charbonneau Dep. at 103:3-6; Ex. 10, Defendant MLOA Supplemental Answer to Interrogatories, Answer to Interrogatory No. 3.

37.     In fact, Loan Officers were required to review and acknowledge their time cards, verifying that it was a complete and accurate representation of their time worked and the amount they were due. MLOA relied on Plaintiff's signed pay records to pay him. Ex. 6, Kneibert Dep. at 114:3-13; Ex. 14, Ives Dep. at 59:9-20.

## II.    Legal Standard

Summary judgment "is an important procedure 'designed to secure the just, speedy and inexpensive determination of every action.'" *Banks v. Armed Forces Bank*, 313 F. Supp. 2d 1095, 1100 (D. Kan. 2004). It is entered when the moving party demonstrates there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  A factual dispute is only material if it might affect the outcome of the suit. *See Benhardt v. Bd. of County Comm'rs*, 9 F. Supp. 2d 1252, 1258 (D. Kan. 1998). A genuine factual issue exists if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party under the standard of proof that would apply at trial. *Id.* In meeting that standard, the movant need not negate the other party's claim—rather, the movant only needs to point out that there is no evidence supporting an essential element of the other party's claim. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once this initial burden is met, the burden shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* The plaintiff "may not rest upon [the] pleadings, but must come forward with specific facts showing there is a genuine issue for trial." *Tipton v. City of Hutchinson, Kansas*, 68 F. Supp. 2d 1239, 1244 (D. Kan. 1999). "Mere conclusory statements are inadequate to defeat a summary judgment motion." *Id.* Finally, a party "may not escape summary judgment on the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## III.     Argument and Authorities

### A.     The Court Should Grant Summary Judgment on Plaintiff's KWPA under Count III.

Plaintiff Charbonneau's KWPA Claim under Count III is preempted by the Fair Labor Standards Act and, even were it not, the incontrovertible facts establish that he has received all wages owed him under the KWPA.

#### 1.     *Plaintiff's KWPA Claim under Count III is Preempted.*

Plaintiff is precluded from seeking unpaid minimum wage and overtime compensation under the KWPA, which is sought in Count III, because that relief is available to him under the FLSA. "The KWPA does not contain any express provision relating to payment of overtime, which is typically pursued under a FLSA claim." C*raig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 73 (2014). The Supreme Court of Kansas has stated that the legislative goal of the KWPA was to "protect Kansas employees who were not then covered by the [FLSA], minimum

wage requirements, or the National Labor Relations Board." *Id.* The District of Kansas has viewed this language "as the Kansas Supreme Court's acknowledgement that 'the KWPA is not the usual mechanism for overtime—and presumably minimum wage—claims under Kansas law.'" *McGowan v. Genesis Health Clubs Mgmt., Inc.*, 2018 WL 572052, at *3 (D. Kan. Jan. 26, 2018) (quoting *Larson v. FGX Int'l, Inc.*, 2015 WL 1034334, at *2 (D. Kan. Mar. 10, 2015)). Instead, the Kansas Minimum Wage and Maximum Hour Law addresses minimum and overtime wages, and courts have looked to it to determine whether a KWPA is viable. *See id.*

The Kansas Minimum Wage and Maximum Hour Law "explicitly excludes from its definition of employer any employer who is subject to the provisions of the FLSA;" *id.* (citing Kan. Stat. Ann. § 44-1202(d)), and the District of Kansas and other courts have consistently concluded that a KWPA claim for overtime wages fails as a matter of law when the employer is subject to the FLSA for that claim. *Id.* (citing several cases[1] holding the same). "That is because any attempt to bring minimum wage or overtime claims against FLSA employers through the KWPA mechanism can only be an attempt to assert the remedies found in §§ 206 and 207 of the

---

[1] The *McGowan* court cited: *Stockton v. Alltite, Inc.*, 2016 WL 3973778, at *2 (D. Kan. July 25, 2016) (dismissing plaintiff's KWPA claim based on unpaid overtime wages because the "state act does not apply to FLSA-covered employers"); *Larson*, 2015 WL 1034334, at *3 (holding that where plaintiff alleged that defendant was a FLSA employer, "her KWPA claims for FLSA minimum wage and overtime violations are not plausible because they are legally impossible"); *Garcia*, 766 F. Supp. 2d at 1186 n.15 (Lungstrum, J.) (explaining that employers "who are covered by the FLSA are expressly exempted from Kansas' overtime statute [the KMWMHL]," so "permitting plaintiffs to recover overtime wages from [defendant] under the KWPA is incompatible with the exemption provision of the KMWMHL and would undermine the integrity of Kansas' wage and hour statutory scheme as a whole."). *See also Wheaton v. Hinz JJ, LLC*, 2014 WL 5311310, at *1–2 (D. Kan. Oct. 16, 2014) (dismissing plaintiff's KWPA claim for minimum wage violations under Rule 12(b)(6) because Kansas law allows a plaintiff to pursue minimum wage violations under the KMWMHL alone and that act expressly exempts FLSA-covered employers like defendant); *Spears v. Mid-America Waffles, Inc.*, 2011 WL 6304126, at *4–5 (D. Kan. Dec. 16, 2011) (denying plaintiffs leave to amend their Complaint to assert a KWPA claim based on defendant's failure to pay minimum wages because such a claim was futile when the KMWMHL expressly exempts employers covered by the FLSA). *Cf. Brown v. Ford Storage & Moving Co.*, 224 P.3d 593, 599 (Kan. Ct. App. 2010) (holding that an employer, who was subject to FLSA regulation, was not an employer under the KMWMHL and had no duty to pay overtime wages under the KMWMHL).

FLSA. The KWPA is therefore not a proper mechanism for asserting such claims." *Larson v. FGX Int'l, Inc.*, 2015 WL 1034334, at *3 (D. Kan. Mar. 10, 2015).

In this case, Count III of Plaintiff's Third Amended Complaint sets forth a claim under the KWPA for unpaid straight time and overtime wages, on behalf of himself and other Loan Officers. It is undisputed that Loan Officers were hourly, non-exempt employees, and that MLOA is subject to the FLSA. The only dispute is whether MLOA failed to compensate Loan Officers for any off-the-clock work at their contract rate, *i.e.* which provides for the payment of the FLSA minimum wage as a draw against commission, and overtime wages, which Plaintiff is seeking under the FLSA. *See* Count II, Third Amended Complaint. As a result, Plaintiff's claim under the KWPA for overtime compensation (and to the extent he seeks unpaid minimum wage compensation) under Count III is preempted by the FLSA. *See McGowan v. Genesis Health Clubs Mgmt., Inc.*, 2018 WL 572052, at *5 (D. Kan. Jan. 26, 2018) ("If the Kansas legislature had intended to permit employees to pursue overtime wage claims under both the Kansas state law and the FLSA, then it never would have included an express exemption in the plain language of the [Kansas Minimum Wage and Maximum Hour Law] excluding FLSA-covered employers.") (citing *Polson v. Farmers Ins. Co., Inc.*, 200 P.3d 1266, 1269-70 (Kan. 2009); *Larson v. FGX Int'l, Inc.*, 2015 WL 1034334, at *3 (D. Kan. Mar. 10, 2015). Plaintiff's claim that Defendants withheld "straight time" wages is also preempted by the FLSA because any claim for "straight time" wages is a claim for minimum wages. Plaintiff's Agreement with MLOA provides: "MLOA shall pay Officer an hourly wage equal to *the then-existing minimum wage, as set forth under applicable Federal and state law*, for each hour Officers performs work for MLOA[.]" SOF ¶ 19. Count III is entirely preempted by the FLSA.

> 2.  *Defendant is Entitled to Summary Judgment on Plaintiff's KWPA "Straight Time" Claim Because He Has Received Well Beyond the Contractually-Required Minimum of $7.25 for Every Hour Worked.*

The KWPA requires that "every employer shall pay all wages due to the employees of the employer at least once during each calendar month[.]" K.S.A. § 44-314(a). But whether a payment is a "wage" under the KPA is "determined by the 'employment contract and employer policies.'" *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 986 (D. Kan. 2018) (citing *Dillard Dep't Stores, Inc. v. State Dep't of Human Res.*, 28 Kan. App. 2d 229, 13 P.3d 358, 362 (2000)). In this case, Plaintiff Charbonneau was entitled to receive "straight time" pay of at least $7.25 an hour for all hours worked (up to 40), which was paid as a draw against commissions. *See* SOF ¶ 19. In other words, Plaintiff is only entitled to receive an hourly wage of $7.25 if his commissions did not result in him receiving $7.25 for all hours worked during that month. But, at all times, Plaintiff received commission payments in amounts that overwhelmingly exceeded the minimum wage for all hours he could have even conceivably worked.

For example, during the 15 months he was a Loan Officer between August 2016 and November 2017, he received between $9,764.81 and $35,000 per month in commissions. SOF ¶ 24. His lowest monthly commission payment was $9,764.81 in April of 2017. SOF ¶ 25. Dividing the total amount of his April 2017 monthly commission payment between the four weeks of that month results in Plaintiff Charbonneau receiving $2,441.20 per week. To advance a claim of unpaid wages under either the KWPA (or a breach of contract theory, as set out below), Plaintiff Charbonneau would have had to have worked over 336 hours that week—i.e. twice the total number of hours in a week.  Because he does not, and obviously could not, claim he worked 200% of the hours in every work week, he has no claim for unpaid "wages" (as

13

defined by the parties' contract) under the KWPA.  The Court should grant summary judgment on this claim.

      **B.**      **Count IV Fails as a Matter of Law Because Credit Report and Appraisal Fees Were Not Wages Earned by Plaintiff, and Were Properly Deducted as a Condition Precedent to Determining Wages Earned.**

Counts IV and V allege Defendants unlawfully deducted certain costs of selling a loan (uncollected fees for borrower credit reports and home appraisals) from Plaintiff's (and putative class members') wages. In other words, Plaintiff asserts that the costs of credit reports and appraisals were "wages" that could not be "with[e]ld, deduct[ed] or divert[ed] under K.S.A. § 44-319. But the KWPA defines "wages" as only those amounts to which an employee has gain an "absolute right." *Core Cashless, LLC v. Kansas Department of Labor*, 2018 WL 3321173, at *10 (Kan. App. July 6, 2018) (citing *Yuille v. Pester Marketing Co.*, 682 P.2d 676, 680–81, 9 Kan. App. 2d 464, 468 (Kan. App. 1984). And the question of whether any employee has obtained an absolute right to receive funds is "determined by the 'employment contract and employer policies.'" *Blair v. TransAm Trucking, Inc.*, 309 F.Supp.3d 977, 986 (D. Kan. 2018) (citing *Dillard Dep't Stores, Inc. v. State Dep't of Human Res.*, 28 Kan. App. 2d 229, 13 P.3d 358, 362 (2000)).

In this case, the parties' contract states that "[Defendant] shall make adjustments in the process of calculating Commission Compensation for shortages for uncollected fees [and] costs for uncollected credit reports" and "*Commission Compensation is not earned until all deductions are made for Hourly Wage [and] shortages for uncollected fees*…." SOF ¶ 21. This is neither illegal nor unusual. To the contrary, "an employment contract may create a condition precedent to the employee's earning of wages." *See Weir v. Anaconda Co.*, 773 F.2d 1073, 1084 (10th Cir. 1985); *Smith v. MCI Telecommunications Corp.*, 755 F. Supp. 354, 358 (D. Kan. 1990); *Weinzirl v. Wells Group, Inc.,* 677 P.2d 1004, 1008 (Kan. 1984). "In determining whether a wage is

earned, a court's task is one of deciding *whether the documents drafted by the employer place a condition precedent on entitlement to the wage* or whether they impose a forfeiture." *Kephart v. Data Systems Intern., Inc.*, 243 F. Supp. 2d 1205, 1229-30 (D. Kan. 2003) (emphasis added). Under Kansas law, a condition precedent is:

> something that is agreed must happen or be performed before a right can occur to enforce the main contract. It is one without the performance of which the contract entered into between the parties cannot be enforced. A condition precedent requires the performance of some act or happening of some event after the terms of the contract, including the condition precedent, have been agreed on before the contract shall take effect.

*Weinzirl*, 677 P.2d at 1008.

This Court and others have repeatedly found that contractual conditions to earning commissions are valid. For example, in *Dressler v. Kansas Copters and Wings, Inc.*, the plaintiff claimed defendants violated K.S.A. 44–319 by withholding his wages to recover money previously paid to him for his training. 2010 WL 3168358, at *8 (D. Kan. Aug. 10, 2010). The defendants contended the requirement that plaintiff be employed by them for three years prior to earning wages equal to the cost of his training was a condition precedent to the payment of those wages. *Id.* The court agreed, stating "[t]he condition on plaintiff's earning his wages had not occurred at the time plaintiff was to receive his final paycheck. The condition was also in place prior to the earning of plaintiff's wages and, therefore, was not a condition subsequent." *Id.* The court also noted, "plaintiff testified that he read and understood the implication of the contract when he signed the agreement." *Id.* The court concluded, "the condition in the employment contract was a valid condition under Kansas law" and "[b]ecause plaintiff admittedly did not meet that condition prior to receiving his final check defendants did not violate Kansas law by withholding his wages." *Id.*

The decision in *Dangerfield v. Montgomery Ward Co., Inc.* is also helpful here. In *Dangerfield,* the Supreme Court of Kansas upheld a district court's order reversing a Kansas Department of Human Resources ("KDHR") officer's finding that Defendant Montgomery Ward reduced the claimants' commissions illegally in violation of K.S.A. § 44–319(a). *Dangerfield v. Montgomery Ward Co., Inc.,* 694 P.2d 439, 440, 236 Kan. 594, 595 (Kan. 1985). The plaintiffs in *Dangerfield* were commissioned salespersons subject to a pay plan which consisted of "a formula utilizing several factors to determine the wages earned by commission salespersons." *Id.* "The wage formula consider[ed] (1) the number of hours worked during the week, (2) sales volume of the employee for the week, and (3) amount, if any, by which the employees' hourly wages exceeded six percent of sales for up to three prior weeks." The plaintiffs were guaranteed a weekly wage "computed on the basis of the hours worked . . . multiplied by the employee's guaranteed hourly rate which is an amount at least equal to or greater than the federal minimum wage." *Id.* at 440. Under the employment agreement, they were also entitled to a weekly commission of 6% of their sales when that commission exceeded their guaranteed weekly wage. *Id.* at 441. In the weeks where the sales commissions were less than the guaranteed weekly wage, the employee still received the guarantee, but the difference between the commissions earned and the guarantee created a "deficit carryover which becomes a deduction from future sales commissions in excess of the minimum guarantee during the four-week period." *Id.* "The deficit carryover is reduced to zero every fourth week in the event that the total sales commissions earned during the period are less than the total amount paid to the employee as the guaranteed wage." The district court found the "commission plan was consistent with the employment agreement between the parties and that it did not violate the Kansas wage payment statutes, particularly K.S.A. 44–319(a)(3)." *Id.* at 442.

The Supreme Court of Kansas agreed, stating "[t]he basic issue in this case is in the determination of what constitutes "wages" under the Ward employment contract." *Id.* at 443. The court noted "the 6% commission was only one element to be considered in determining the actual wages earned during any particular computation period" and it saw nothing that "prevent[s] the use of a combination of the factors in K.S.A. 44–313 in arriving at the actual wages of the employee so long as the same does not violate any other statute or the agreement of the parties." *Id.* The court further quoted the district court, which stated:

> [A]n employer and employee are free to contract the terms of compensation and it is the employment agreement of the parties that determines the method of wage computation." We see no reason why the parties may not contract to include provisions for reconciliation of deficit carryover against sales commissions to determine the final amount of wages due when it is done within a four-week pay period. This construction of the employment contract renders it compatible with the Kansas Wage and Hour Act.

*Id.* at 443-44.

Here, the compensation agreements between MLOA and Plaintiff show that uncollected credit report and appraisal fees were not part of Plaintiff's "earned" wages. Rather, those fees were properly reconciled against the Total Gross Commission Income in accordance with the commission calculation set forth in the parties' contract. SOF ¶¶ 14, 21. Similarly, appraisal fees were deducted from Plaintiff's Total Gross Commission Income if Plaintiff did not collect that fee from the borrower and the borrower never paid that fee. *Id.*

Plaintiff's claims under Counts IV and V to recover the fees associated with credit reports and appraisals hinge on the notion that these fees were "wages" under the contract that were not subject to deduction. But, under the agreement, those fees were never *earned* by Plaintiff, other Loan Officers, or other Team Leads. Rather, the contract says the opposite is true: a commission is not earned until all such fees are reconciled against the gross commission payment. Because

Plaintiff had not "earned" the fees that were deducted under the Agreements, the component of the commission payment that should have been subtracted as a recoverable fee or cost does not qualify as a "wage" under the statute. *See Dressler*, 2010 WL 3168358, at *8. The Court should grant Defendants summary judgment on Plaintiffs' deduction claim.

### C.     Plaintiff's Breach of Contract Claims under Counts VI and VII Fail as a Matter of Law.

Plaintiff has asserted the identical claims for alleged unpaid "wages" and alleged deductions from wages under both a statutory theory—the KWPA—and a breach of contract theory.  But these claims are no more viable under contract law than they were under the KWPA. The elements of a breach of contract claim under Kansas law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract, and (5) that plaintiff suffered damage caused by the breach. *Britvic Soft Drinks, Ltd. V. ACSIS Techs., Inc.,* 265 F.Supp.2d 1179, 1187 (D. Kan. 2003).  Here, Plaintiff cannot meet the last three elements of those claims and, even if he could, he has waived his right to seek a remedy under contract law.

### 1.     *Any Breach of Contract By Defendants under Count VI Resulted Only Because Plaintiff Initially Breached the Contract By Failing to Follow the Terms of the Agreement Between the Parties.*

Count IV is premised on the fact that Loan Officers, who were hourly employees, received a monthly advance equal to minimum wage, which was then reconciled with commission Plaintiff actually earned. But Plaintiff waived his right to proceed on this claim; and second, Plaintiff did not suffer any damages.

Under Kansas law, "waiver is the voluntary and intentional relinquishment of a known right." *Bettis v. Hall*, 852 F. Supp. 2d 1325, 1340 (D. Kan. 2012). For a breach of contract claim, a court may infer waiver based on the conduct of a party to a contract. *Id.*; *Affiliated Foods*

*Midwest Co-op., Inc. v. Wolf Creek Marketplace*, 2011 WL 231420, at *4 (D. Kan. Jan. 24, 2011). "Generally, where a party to a contract has knowledge of breach by the other party, yet continues to receive money in the performance of the contract, the breach will be deemed to have been waived." *Id.*

> The language of the Exhibit A: Loan Officer Compensation provides:
>
> MLOA shall pay Officer an hourly wage equal to the then-existing minimum wage, as set forth under applicable Federal and state law, for each hour Officers performs work for MLOA, subject to the standard withholding requirements such as federal, state and local income tax, social security and medical contributions ("Hourly Wage"). **The Hourly Wage is considered an advance against future commission payments paid to Officer. Future commission payments will be reduced by the amount of the advance.** However, Officer shall not be paid less each month than the amount of Hourly Wage[.]

SOF ¶ 19.

Plaintiff agreed that the advance Hourly Wage he received, *i.e.* the time he worked multiplied by the minimum wage, would be reconciled with his commission. SOF ¶ 19. There is no dispute that Plaintiff was paid in this way; indeed, Plaintiff's claim is premised on the fact that he *was* paid under the terms of the agreement. *See e.g.* Doc. 94 at ¶¶ 59, 153, 170.

Additionally, Plaintiff failed to perform in compliance with the agreement. Under his compensation agreement, Plaintiff was "required to use the MLOA time clock system to record [his] hours worked." SOF ¶ 19. He also agreed to notify MLOA, as soon as possible, in the event that he failed to correctly record his time or enter in in into MLOA's timekeeping system. *Id.* Indeed, there are numerous instances where Plaintiff did just that, notifying MLOA about missed clock-ins or clock-outs, and work he performed while at home or out of the office. SOF ¶¶ 29-35. So not only did Plaintiff agreed to the process and procedures for correcting his time, he, in fact, utilized the process for making such corrections. Any failure by MLOA to pay Plaintiff for his hours worked is a only because Plaintiff, in the first instance, failed to perform in

accordance with the contract by reporting his off-the-clock work to MLOA, despite explicitly agreeing to the terms requiring him to do so, and his familiarity with the process to report that time. As a result, Plaintiff has waived his right to proceed on this claim. *See Bettis*, 852 F. Supp. 2d at 1340 ("A court may infer waiver [of the right to proceed on a breach of contract claim] from the conduct of a party to a contract[.]"); *Affiliated Foods Midwest Co-op.*, 2011 WL 231420, at *4.

2.    *Plaintiff's Contract Claim for Alleged Unpaid Straight Time Fails for the Same Reasons it Fails under the KWPA.*

Plaintiff's breach of contract claim for purportedly unpaid "straight time" fails as a matter of law because he has no damages under the plain terms of his Loan Officer Agreement and Compensation Schedule. As outlined above, Plaintiff was entitled to receive straight time payments of $7.25 for every hours worked only as an advance against earned commissions and he would *only* be entitled to $7.25 an hour in *addition* to earned commissions if his commissions were insufficient to equal at least $7.25 for every hour worked.  Because Plaintiff's commissions always *substantially* exceeded $7.25 an hour *for every hour in every week he worked*, he has neither a KWPA claim nor a breach of contract claim for unpaid straight time.

3.    *Defendant is Entitled to Summary Judgment on Count VII Because Plaintiff Has Not Demonstrated That Defendants Breached the Contract by Reconciling the Costs of Fees During the Commission Calculation Process.*

The basis of Count VII is that employee's net commissions were reduced by the costs of uncollected credit report fees and appraisal fees. For the reasons Counts III and IV fail under the KWPA, this claim fails as well. That is, the Agreement explicitly details how Plaintiff's commission is calculated, which included specific provisions stating that his commission did not include shortages for uncollected fees *or* costs for uncollected credit reports. SOF ¶¶ 14, 21. The

Agreement also states that commission is not earned until those deductions (as well as standard withholdings, such as federal, state, and local income tax, social security, and medical contribution) were made. It is undisputed that MLOA paid Plaintiff consistent with that provision of the compensation agreement (SOF ¶¶ 22-23).  In fact, that is precisely what Plaintiff is complaining about.  But he cannot advance a claim for breach of contract with respect to any deductions applied for the cost of credit reports or uncollected appraisal fees during the calculation process for his commissions when the very contract upon which he relies expressly states that this must happen before commission is earned. The Court should grant summary judgment on this claim.

> **D.** **The Court Should Grant Summary Judgment on Plaintiff's Claim for Unjust Enrichment/Quantum Meruit under Count V Because He Has an Agreement that Provides an Adequate Remedy at Law.**

Plaintiff pleads Count V as an alternative to theory to his statutory claim for unpaid wages. "A claim for unjust enrichment is an equitable claim, and generally an equitable remedy is not available when an adequate remedy exists under another legal claim." *Deeds v. Waddell & Reed Inv. Mgmt. Co.*, 280 P.3d 786, 795 (2012) (citing *Nelson v. Nelson*, 205 P.3d 715 (2009)). Plaintiff is seeking the same damages under the FLSA, and Defendants are not challenging that claim on summary judgment. As a result, summary judgment on Count V is appropriate. *See Garcia v. Tyson Foods, Inc.*, 766 F. Supp. 2d 1167, 1188 (D. Kan. 2011) (dismissing quantum meruit claim as duplicative of state statutory claim, and citing cases holding the same).

## IV.    Conclusion

For the foregoing reasons, Defendants respectfully request that this Court enter summary judgment in their favor as to Plaintiff's claims under the Kansas Wage Payment Act, as set forth in Counts III and IV; for unjust enrichment/quantum meruit under Kansas common law as set

forth in Count V; and breach of contract under Kansas common law as set forth in Count VI and

VII.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

/s/ Chris R. Pace
Chris R. Pace                KS #17178
Justin M. Dean              KS #19636
Katherine K. Paulus        KS #23866
4520 Main Street, Suite 400
Kansas City, Missouri 64111
816.471.1301
816.471.1303 *(Facsimile)*
chris.pace@ogletree.com
justin.dean@ogletree.com
katherine.paulus@ogletree.com

**ATTORNEYS FOR DEFENDANT
MORTGAGE LENDERS OF AMERICA
L.L.C.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 20th day of March, 2020, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent an electronic notice to the following:

Brett A. Davis
Tracey F. George
Nicholas J. Walker
DAVIS GEORGE MOOK L.L.C.
1600 Genessee, Suite 328
Kansas City, MO  64102
816.569.2629 / 816.447.3939 (*Facsimile*)
Brett@dgmlawyers.com
tracey@dgmlawyers.com
nick@dgmlawyers.com

**ATTORNEYS FOR PLAINTIFF**

/s/ Chris R. Pace
**ATTORNEY FOR DEFENDANT**

41567411.2