# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **BEAU CHARBONNEAU, on behalf of himself and others similarly situated,** | |
| **Plaintiff,** | **Case No. 2:18-cv-2062-HLT-ADM** |
| **v.** | |
| **MORTGAGE LENDERS OF AMERICA, L.L.C., et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Beau Charbonneau brings this putative collective and class action under the Fair Labor Standards Act ("FLSA") and the Kansas Wage Payment Act ("KWPA"). Plaintiff also alleges state law claims for breach of contract and unjust enrichment/quantum meruit. Plaintiff claims that his former employer—Defendant Mortgage Lenders of America, L.L.C. ("Defendant MLOA")—misclassified a certain employment position ("team lead") as an exempt position.[1] Plaintiff also claims that Defendant MLOA requires non-exempt employees (specifically, loan officers) to perform work off the clock, without pay, and that Defendant MLOA unlawfully deducted certain fees from Plaintiff's wages. This matter is before the Court on Defendants' Motion for Partial Summary Judgment. Doc. 144. For the reasons stated below, the Court grants summary judgment on Plaintiff's breach of contract claims because Plaintiff has not demonstrated (1) any damages based on loss of straight-time pay, or (2) a breach of any contractual promise

---

[1] Plaintiff's FLSA claims are also brought against Defendants Philip Kneibert and Bradley Ives. But the claims currently before the Court on the motion for partial summary judgment are only brought against Defendant MLOA. Despite the claims at issue in this motion only being brought against Defendant MLOA, all three Defendants join in the motion for partial summary judgment. Whether Defendant MLOA misclassified the team lead position is not at issue in the motion currently before the Court.

regarding overtime wages or the withholding of certain fees. The Court also grants summary judgment on Plaintiff's claims under the KWPA because (1) Plaintiff's only statutory cause of action for unpaid straight-time and overtime wages is under the FLSA, and (2) Plaintiff has not presented a genuine issue of fact that any earned wages were wrongfully withheld.

## I.    BACKGROUND

This case was recently transferred to the undersigned judge. Although the case has been on file for more than two years, a pretrial order has not yet been entered. The Court's discussion of Plaintiff's claims, therefore, is drawn from Plaintiff's claims as described in Plaintiff's Third Amended Complaint. Doc. 93. The discussion of the uncontroverted facts, however, is drawn from the properly cited and supported record, viewed in the light most favorable to Plaintiff.

### A.    Uncontroverted Facts

Plaintiff is a former employee of Defendant MLOA. While an employee, Plaintiff worked in two different capacities: as a loan officer and as a team lead. He was a loan officer during two separate periods of time and a team lead for a single period of about three years in between. Plaintiff's employment in each role was governed by one or more employment agreements.

#### 1.    Originator Compensation Agreement (Loan Officer Position #1)

Plaintiff started as a loan officer and signed an Originator Compensation Agreement on January 8, 2008 (an agreement for loan officers). Section 2 of that agreement, regarding compensation, provides:

> 2.1 The commission earned on funded loans shall be based on the schedule outlined in Exhibit "A." Originator understands that the Daily Price Sheet shall be modified from time to time by MLOA or the applicable investor in its sole discretion.
>
> 2.2 All compensation shall be subject to standard withholding requirements such as federal state and local income tax, social security, and major medical contributions.

> 2.3 Commissions shall be payable monthly on the 15th of the month for loans that funded during the previous month. See exhibit "A" for more details.
>
> 2.4 An hourly wage equal to minimum wage for the applicable period shall be paid twice monthly (15th and last day of the month). See exhibit "A" for more details.

Doc. 145-1 at 2. Section 3.1 of same agreement (which is related to termination of employment) further provides that "[c]ommissions shall be paid after the deduction of any amounts due MLOA and deductions for any unreturned company equipment." *Id.* Exhibit A to the agreement, titled "Commission Schedule," states, "Retail Loan Officers will be paid minimum wage of $5.85 per hour for hours worked, and will be eligible for overtime pay." *Id.* at 5. Between February 2013 and August 2013, the lowest monthly commission Plaintiff made was $11,369.24.

## 2. Exhibit A to the Loan Originator Manager Compensation Schedule (Team Lead Agreement)

Plaintiff then worked as a team lead for about three years beginning in August 2013.[2] In this position, Plaintiff sold loans and managed loan officers. Plaintiff's monthly pay had three components: $175 per loan officer on his team for the entirety of the prior month; a 4% commission of all loans funded by his reporting loan officers; and a commission of loans that Plaintiff originated and funded. Plaintiff signed Exhibit A to the Loan Originator Manager Compensation Schedule, which detailed his compensation. Doc. 145-5 at 5.

The "Time of Calculation and Payment of Commissions" section of the agreement provides:

> Commissions (to the extent earned pursuant to the calculations set forth below and subject to applicable adjustments) shall be payable monthly on the fifteenth (15th) of the month for loans that fund

---

[2]  Plaintiff's job title changed from "team lead" to "loan origination manager" in 2016, but the nature of the position did not.

> during the previous month. Loans shall be considered funded when loan proceeds are disbursed at a loan closing and all applicable loan documents are in the possession of MLOA and have been duly executed. See also the Commission Conditions set forth below concerning the time that commissions are earned.

*Id.* at 4. The agreement contains a "Required Lender Fees" section, which provides: "Manager is required to collect lender fees in advance from borrowers on each loan in accordance with MLOA policies as adopted, pronounced or changed from time to time." *Id*. at 3. And the agreement provides that Defendant MLOA may—but is not required to—contribute toward the costs of ordering credit reports. *Id.*

The agreement also includes a "Formula for Calculating Commissions":

> To calculate the Commission Compensation, MLOA will first total GCI assigned to all loans originated by Manager for which Manager is entitled to a commission that funded during the preceding month ("Total GCI"). Percentages will then be applied to the Total GCI . . . .

> The "GCI Payout" will be equal to Total GCI multiplied by the applicable percentages . . . . The amount of Commission Compensation paid to Manager will be equal to the GCI Payout after deductions for the amount of the Hourly Wage, shortages for uncollected fees, uncollected costs for credit reports, and any commissions previously advanced for EPOs and EPDs. See also the Commission Conditions set forth below concerning the time that commissions are earned.

*Id*. at 4.[3]

Finally, importantly for the purposes of this motion, the "Commission Conditions" section of the agreement specifies:

> MLOA shall make adjustments in the process of calculating Commission Compensation for Hourly Wage, shortages for uncollected fees, costs for uncollected credit reports and commissions paid to Manager on EPOs or EPDs.

---

[3]  "Early Pay-offs (EPO) and Early Payment Defaults (EPD) occur when a loan file is either paid-in-full (paid off) early or if the borrowers fail to comply with the terms of loan documents during the early term of the loan." Doc. 145-5 at 3.

. . . .

> Commission Compensation is not earned until all deductions are
> made for Hourly Wage, shortages for uncollected fees, and
> uncollected costs for credit reports, pursuant to the formula for
> calculating commissions.

*Id*. Plaintiff claims that the actual calculation of commissions was not in conformity with this

agreement. In support, Plaintiff points to the testimony of Defendant MLOA's president, Philip

Kneibert, who testified (over objection) that Defendant MLOA deducted credit report fees and

uncollected appraisal fees "from the wages of [its] producers." Doc. 156-1 at 260:21-261:12,

267:1-6. Plaintiff also submits his own pay stub for the pay period ending September 9, 2017

(which was after Plaintiff returned to his position as a loan officer). This stub shows credit reports

and appraisal fees deducted post-tax, which was Defendant MLOA's policy at the time. Doc. 156-

20.

### 3.     Exhibit A to the Loan Officer Compensation Schedule (Loan Officer Position #2)

On August 1, 2016, Plaintiff returned to the position of loan officer, which he held until

leaving Defendant MLOA's employment on November 10, 2017. Loan officers are hourly

employees, so Plaintiff entered into a new compensation agreement, which included Exhibit A to

the Loan Officer Compensation Schedule. Doc. 145-7. This agreement provides that loan officers

are paid commissions, but they receive an hourly wage equivalent to the federal minimum wage

as a draw against those commissions. Specifically, the agreement states:

> MLOA shall pay Officer an hourly wage equal to the then-existing
> minimum wage, as set forth under applicable Federal and state law,
> for each hour Officer performs work for MLOA, subject to the
> standard withholding requirements such as federal, state and local
> income tax, social security and medical contributions ("Hourly
> Wage"). The Hourly Wage is considered an advance against future
> commission payments paid to Officer. Future commission payments

will be reduced by the amount of the advance. However, Officer shall not be paid less each month than the amount of Hourly Wage, regardless of the amount of Commission Compensation, as calculated under the section on Commission Compensation below . . . .

Officer will be paid the hourly wage twice monthly, on the fifteenth (15th) and last day of the month, pursuant to MLOA's standard payroll practices. Officer will be eligible for overtime pay in accordance with the applicable law. The amount of overtime pay will not be deducted from the amount of commission payments. Officer is required to obtain written permission from Officer's Loan Originator manager, also known as the Team Lead or Team Leader, in advance before overtime work is performed. Unauthorized overtime work may subject Officer to verbal or written warning and/or disciplinary action, up to and including termination.

Officer is required to use the MLOA time clock system to record Officer's hours worked. Officer shall notify Officer's Loan Originator manager as soon as possible, if Officer misses or incorrectly records an entry into the time keeping system. MLOA has the right to adjust the time clock record to accurately report the time Officer worked.

*Id.* at 2. This agreement also includes a section on "Required Lender Fees," which states, "Officer is required to collect lender fees in advance from borrowers on each loan in accordance with MLOA policies as adopted, pronounced or changed from time to time." *Id.* at 4. And like the provision included in Plaintiff's team-lead agreement, this agreement contains a "Commissions Condition" section:

MLOA shall make adjustments in the process of calculating Commission Compensation for Hourly wage, shortages for uncollected fees, costs for uncollected credit reports and commissions paid to Officer on EPOs or EPDs.

. . . .

Commission Compensation is not earned until all deductions are made for Hourly Wage, shortages for uncollected fees, and uncollected costs for credit reports, pursuant to the formula for calculating commissions.

*Id.* at 5. Again, Plaintiff claims that Defendant MLOA's actual practice was inconsistent with this process.

During the fifteen months Plaintiff was a loan officer in 2016-17, he received between $9,764.81 and $35,000 per month in commissions.

### B.    Plaintiff's Claims

Plaintiff brings two claims under the FLSA (Counts I and II) that are not at issue in the present motion. Plaintiff also brings a claim for unjust enrichment/quantum meruit (Count V) that he voluntarily dismisses through his response brief. The remaining claims at issue are:

- <u>Count III</u>: Plaintiff, in his role as a loan officer, alleges that Defendant MLOA is liable under the KWPA for "unlawful withholding of straight time and overtime wages." Doc. 93 at 23 ¶ 148. Plaintiff claims that, "[b]y failing to accurately record, maintain records of, and pay for Plaintiff's . . . actual hours worked, Defendant MLOA willfully reduced the total number of hours on Plaintiff's . . . paychecks." *Id.* at 24 ¶ 152.

- <u>Count IV</u>: Plaintiff, in both his roles as a loan officer and as a team lead, alleges that Defendant MLOA "withheld, deducted, or diverted certain credit report fees and appraisal fees from Plaintiff's . . . wages." *Id.* at 26 ¶ 161. Plaintiff claims that this act violates the KWPA because the KWPA prohibits "withholding, deducting, or diverting any portion of Plaintiff's . . . wages, except under . . . limited circumstances . . . ." *Id.* at 26 ¶ 160.

- <u>Count VI</u>: Plaintiff, in his role as a loan officer, claims that Defendant MLOA breached its employment compensation agreements with Plaintiff. This breach was based both on (1) Defendant MLOA's failure to compensate Plaintiff for all hours worked, including straight time and overtime, as well as (2) Defendant MLOA's failure to pay Plaintiff all "contractually promised wages when it withheld, deducted, or diverted credit report fees and appraisal fees from earned wages." *Id.* at 29 ¶¶ 172-73.

- <u>Count VII</u>: Plaintiff, in his role as a team lead, alleges that Defendant MLOA breached the parties' employment agreement by failing to pay Plaintiff all contractually-promised wages when it "withheld, deducted, or diverted credit report fees and appraisal fees from earned wages." *Id.* at 30-31 ¶ 178.

Plaintiff brings all four of these claims on his own behalf, as well as on behalf of putative classes defined in the complaint. Plaintiff has filed a motion to certify those classes. Doc. 133.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   ANALYSIS

### A.    Breach of Contract Claims (Counts VI and VII)

Although the breach of contract claims are not chronologically first in Plaintiff's complaint, the Court turns to them first because they form the basis for at least some of Plaintiff's KWPA claims.

#### 1.    Contract Interpretation

When reviewing contracts, courts first look "to determine the parties' intent from the four corners of the instrument by construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Metro. Life Ins. Co. v. Strnad*, 876 P.2d 1362, 1371 (Kan. 1994) (citations omitted). If the terms of the contract are unambiguous, a court considers only the plain language of the contract—not applying rules of construction. *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011) (citations omitted). Upon a finding of ambiguity, however, a court may look outside the contract to extrinsic or parol evidence in interpreting the

contract's language. *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 264 (Kan. 2013) (citations omitted).

The question of whether a written contract is ambiguous is one of law for a court. *See id.* at 265 (citation omitted). The contract's meaning is determined from the common, plain, and general meaning of the terms used. *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 738 P.2d 866, 871 (Kan. 1987) (citation omitted). "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992) (citation omitted). Put simply, an ambiguous contract contains "provisions or language of doubtful or conflicting meaning." *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 888 (Kan. 1992).

## 2. Count VI: Loan Officer Claim for Unpaid Wages and Improper Deductions

Plaintiff claims that when he was a loan officer, Defendant MLOA breached their employment contracts by failing to pay all straight-time and overtime wages due. He further claims that the deductions for fees and credit reports breached their agreements. The Court addresses each type of alleged breach separately. The elements for a breach of contract claim in Kansas are well-known: (1) a contract between the parties; (2) consideration; (3) performance or willingness to perform by the plaintiff; (4) a breach by the defendant; and (5) damages suffered by the plaintiff as a result of the breach. *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003) (citing PIK - Civil 3d 124.01-A).

First, the Court considers Defendant MLOA's alleged failure to pay all straight-time minimum wages due.[4] For this claim, Plaintiff cannot show damages. Under the loan officer contracts, Plaintiff was only entitled to a minimum wage for the hours he worked. Even if the Court were to assume that Plaintiff did not—or could not—turn in all hours worked up to 40 in a given week, the uncontroverted evidence shows that Plaintiff never made less than $9,764.81 in a month as a loan officer. If this commission were divided amongst the four weeks of the month, Plaintiff received $2,441.20 per week. At the minimum wage of $7.25 per hour, Plaintiff would have had to have worked over 336 hours that week—which is double the number of hours in a week. His commissions for other weeks were even higher. Based on this, Plaintiff cannot show damages for any unpaid straight-time pay. The agreements unambiguously promised that Plaintiff would receive minimum wage for the hours he worked. It is undisputed that Plaintiff received far more than that amount. And no reasonable jury could conclude otherwise.

Second, the Court considers Defendant MLOA's alleged failure to pay overtime due. With respect to overtime, the language of the agreements stated only: "[O]fficer will be eligible for overtime pay in accordance with the applicable law. The amount of overtime pay will not be deducted from the amount of commission payments" and Officer "will be eligible for overtime pay." Docs. 145-7 at 2; 145-1 at 5. These statements do not create an enforceable contractual

---

[4] Plaintiff urges the Court not to "dissect" his claims into claims for straight-time wages and overtime wages. Doc. 156 at 52. In support, Plaintiff cites *Speer v. Cerner Corp.*, 2016 WL 5395268, at *11 (W.D. Mo. 2016). In *Speer*, the court found that the plaintiffs had standing to pursue class claims based on pay types that the plaintiffs did not personally receive. 2016 WL 5395268, at *11. But in this case, Defendant MLOA does not challenge Plaintiff's standing; instead, Defendant MLOA argues that Plaintiff cannot establish the elements for a breach of contract. And this Court adheres to the basic principle that a party must have suffered injury to state a viable breach of contract claim. As explained herein, it is beyond debate that Plaintiff did not suffer any injury from any loss of straight-time wages. With due respect to the *Speer* court, this Court will not allow Plaintiff to aggregate his claim so as to mask this lack of damages. Rather, the Court finds it both necessary and proper to look at Plaintiff's claims individually. The Court also notes that throughout Plaintiff's complaint, he refers to wages for straight time and overtime in the conjunctive—not as one combined sum. *See, e.g.*, Doc. 93 at 9 ¶ 61, 12 ¶ 82, 19 ¶ 123.f., 23 ¶ 148, 23 ¶ 151, 24 ¶ 154, & 29 ¶ 172.

commitment to pay overtime for all hours worked. Instead, they constitute a description of policy and reiterate that Defendant MLOA will comply with applicable law on overtime—an obligation that MLOA has regardless of the employment contract. *See, e.g.*, *Kerstien v. McGraw-Hill Cos.*, 7 F. App'x 868, 873 (10th Cir. 2001) ("[A] statement that is merely a description of policy does not constitute a promise or commitment by an employer."). Noticeably absent from the employment contracts is an overt promise to pay overtime <u>for all hours worked</u>, as Plaintiff repeatedly claims in his response brief. Doc. 156 at 9, 19, 43, 44, & 54. Defendant MLOA's general statement that Plaintiff is eligible for overtime in accordance with applicable laws is nothing more than a reiteration of something it is already bound to do.[5] *See Apperson v. Sec. State Bank*, 528 P.2d 1211, 1219 (Kan. 1974) ("[A]n agreement to do or the doing of that which a person is already bound to do does not constitute a sufficient consideration for a new promise."). This commitment does not create an enforceable contractual provision as a matter of law.[6] *See Parrott v. Samsung Elecs. Am., Inc.*, 2019 WL 1058196, at *3-4 (D. Kan. 2019) (collecting cases and declining to recognize a breach of implied contract claim based on an employer's stated intent to comply with anti-discrimination laws).

Third, the Court turns to the deductions that Plaintiff claims breached the contracts. The problem with most of this claim is that Plaintiff alleges Defendant MLOA breached the contracts by doing what the contracts said Defendant MLOA could do—take deductions from Plaintiff's commissions for uncollected fees and costs. Plaintiff's second loan officer compensation schedule unambiguously stated:

---

[5]   Indeed, Plaintiff also brought FLSA claims for overtime, so he will still be pursuing the same money through different channels.

[6]   Because there is not an enforceable contractual provision promising overtime for all hours worked, the Court need not reach the parties' arguments on whether it was futile for Plaintiff to attempt to report overtime.

> MLOA shall make adjustments in the process of calculating Commission Compensation for Hourly wage, shortages for uncollected fees, costs for uncollected credit reports and commissions paid to Officer on EPOs or EPDs.
>
> . . . .
>
> Commission Compensation is not earned until all deductions are made for Hourly Wage, shortages for uncollected fees, and uncollected costs for credit reports, pursuant to the formula for calculating commissions.

Doc. 145-7 at 5. It is the "adjustments," or deductions, authorized by this agreement that Plaintiff contests. But they are both clearly contemplated and authorized by the contract. Defendant MLOA's practice of making the deductions, therefore, is not a breach of the contract. Rather, this is a case of Plaintiff being unhappy with the terms of the contracts.

There are three issues regarding the deductions, however, that merit more discussion—two of which the parties discuss at length, and one of which they do not. First, in December 2015,[7] Defendant MLOA began deducting a penalty for uncollected appraisals instead of the actual cost of the uncollected appraisals.[8] Second, for a period of thirteen months beginning in 2017, Defendant MLOA deducted the fees from commissions post-tax instead of pre-tax. And third, the Court assumes that Plaintiff claims there were deductions before August 2013, when Plaintiff was under a contract that did not specify how any deductions would be treated.[9] The Court discusses each of these practices below.

---

[7]  At this time, Plaintiff was actually a team lead. But the policy apparently continued through when Plaintiff returned to a position as a loan officer. Plaintiff had one of these penalties deducted from his pay in October 2017, after he had become a loan officer again.

[8]  The penalty was in lieu of the deductions for the amounts of uncollected appraisal fees, not in addition.

[9]  Neither of the parties addressed the language of the two different loan officer contracts separately with respect to this claim. Perhaps this is because not many employees were under a 2008 contract, as Plaintiff was. But Plaintiff's individual claims are at issue here, so the Court must look at his individual employment contracts.

Penalties for uncollected appraisals were not directly addressed in the parties' 2013 (team lead) or 2016 (loan officer) contracts. But Defendant MLOA established a policy providing that it would make these deductions. And the contracts allow for—and even contemplate—policies being developed. They specify that the team lead or loan officer is "required to collect lender fees in advance from borrowers on each loan in accordance with MLOA policies as adopted, pronounced or changed from time to time." Doc. 145-7 at 4; *see also* Doc. 145-5 at 3. Although the contracts did not refer to penalties, they did refer to both appraisal fees and policies to be adopted. The Court determines that deductions for the penalties did not breach the contracts as a matter of law.

As for the post-tax deductions that began in 2017, this practice gives the Court pause. The practice certainly seems inconsistent with Defendant MLOA's contractual statement on the computation of commissions. While the contract states that commissions are only earned <u>after</u> the deductions were made, Defendant MLOA was reporting commission amounts to the IRS <u>before</u> the deductions. It may be that this practice states <u>some</u> cause of action. But this Court cannot find that it breaches the employment contract that was in place at the time. To do so would conflate the characterization of payments to Plaintiff for tax purposes with the determination of when wages were earned—a distinct time that the 2016 contract (as well as the 2013 contract) expressly provides.

Finally, in the pre-August 2013 loan officer contract, there is no mention of deductions other than when a party's employment is terminated.[10] This contract appears neither to authorize nor prohibit deductions. Further, Plaintiff has not pointed the Court to any evidence of deductions that were made during this time period. In the absence of such evidence, there is not a genuine

---

[10] Even this reference is a more generic reference to deductions—not specifically referencing uncollected fees and credit report costs.

issue of material fact as to whether the first contract was breached and no reasonable jury could find for Plaintiff on the evidence before the Court.

For these reasons, the Court concludes that Defendant MLOA has established that it is entitled to summary judgment on Plaintiff's loan officer breach of contract claim.

### 3. Count VII: Team Lead Claim for Improper Deductions

Plaintiff's claim for breach of contract in Count VII (as team lead) is subject to the same fate as his breach claim in Count VI for improper deductions when Plaintiff was a loan officer. Defendant MLOA is therefore entitled to summary judgment on Plaintiff's team lead breach of contract claim.

### B. Claims Under the KWPA (Counts III and IV)

Before turning to the content of Plaintiff's claims in Counts III and IV, the Court believes a brief discussion of the background law that applies to these claims would be beneficial.

### 1. The FLSA, KMWMHL, and KWPA

Kansas employees who believe that their employer has shorted them wages have various options to attempt to recover those wages. The FLSA provides a federal cause of action for minimum wage and overtime claims against some employers. 29 U.S.C. §§ 206, 207. Under the FLSA, similarly-situated employees may "opt in" to an FLSA case to become parties to a "collective action." *See Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1245 (10th Cir. 2016). Against employers not covered by the FLSA, Kansas employees may bring a minimum wage or overtime claim under the Kansas Minimum Wage Maximum Hour Law ("KMWMHL"). K.S.A. § 44-1202(d); *Brown v. Food Storage & Moving Co.*, 224 P.3d 593, 596 (Kan. Ct. App. 2010) (citing K.S.A. § 44-1204(c)(1)). And there is the KWPA, which "gives employees the right to receive their 'wages due' and concerns when and how those wages are paid out." *Garcia v. Tyson*

14

*Foods, Inc.*, 766 F. Supp. 2d 1167, 1187 (D. Kan. 2011). To understand the role of the KWPA, a short primer on the KWPA's history is helpful:

> The KWPA is an expansive and comprehensive legislative scheme that is broad in its scope and the rights created for Kansas workers to secure unpaid wages earned from their labors. It was enacted in 1973 and primarily sought to address problems being encountered by employees of small businesses. The KWPA's primary concern was to protect low income workers who were shorted, docked, or cheated out of pay for services performed. A goal of the legislation was to protect Kansas employees who were not then covered by the Fair Labor Standards Act (FLSA), minimum wage requirements, or the National Labor Relations Board.
>
> The KWPA controls several aspects of wages and benefits for the Kansas worker that are not covered by the [FLSA]. The KWPA governs when wages must be paid, the manner in which they must be paid, and the circumstances in which wages can be withheld. The KWPA also requires employers to provide certain notice requirements with respect to the payment of wages and the provision of benefits. It provides for remedies and penalties for violation of its requirements.

*Craig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 73 (Kan. 2014).

The KWPA is not a source of substantive rights.[11] *Larson v. FGX Intern., Inc.*, 2015 WL 1034334, at *2 (D. Kan. 2015). Instead, it "provides a very general state-law mechanism for enforcing the payment of wages earned by employees." *Id.* at *2. The KPWA does not expressly refer to overtime payments; according to the Kansas Supreme Court, those payments are "typically pursued under a FLSA claim." *Craig*, 335 P.3d at 73; s*ee also Larson*, 2015 WL 1034334, at *2 ("[T]he KWPA is not the usual mechanism for overtime—and presumably minimum wage—claims under Kansas law."); *Gipson v. Sw. Bell Tel. Co.*, 2008 WL 4307617, at *1 (D. Kan. 2008) ("Unlike the KWPA, the [KMWMHL] covers overtime pay."). The Kansas wage laws do not

---

[11] The Kansas Supreme Court has said, however, that K.S.A. § 44-319(a)(3) provides a cause of action for withholding an employee's wages without written authorization, which is a statutory prohibition under the KWPA. *Temmen v. Kent-Brown Chevrolet Co.*, 605 P.2d 95, 99-100 (Kan. 1980).

provide for a collective action like under the FLSA; group actions based on Kansas wage laws are brought under Rule 23, as a class action.

With this background in mind, the Court turns to Plaintiff's KWPA claims.

### 2. Count III: Claim for Unpaid Wages while a Loan Officer

The parties each frame the first KWPA issue differently. Defendant MLOA believes that the relevant question is whether the KWPA provides a cause of action for minimum wage and overtime claims against an FLSA-covered employer for failing to pay all "wages due." Plaintiff, on the other hand, believes the relevant question is whether the KWPA provides a cause of action for an employer's breach of a contract to pay all wages due.

The Court agrees with Defendant's view of the relevant question for two reasons. First, the Court has already decided that Plaintiff's breach of contract claim for unpaid wages is not viable. This lack of viability necessarily means that Plaintiff's KWPA claim for the same wages based solely on a breach of contract must also fail. Although the Court conducts more in-depth analysis below on Plaintiff's KWPA claim, failure of his breach of contract claim alternatively serves as a basis for summary judgment on Count III. Second, although the parties had employment contracts, they unambiguously promised that Plaintiff would be paid the federal minimum wage for all hours worked. They further plainly stated that Plaintiff would be eligible for overtime as permitted by law. That is where rights under the FLSA and the contracts converge, because Plaintiff's rights under the contracts are the same as what is required under the FLSA and the KMWMHL. So the question must be, as Defendant MLOA suggests, whether the KWPA provides a cause of action for minimum wage and overtime claims against an FLSA-covered employer for failing to pay all "wages due."

Plaintiff additionally urges the Court to be less specific in its review and to characterize the claim as Plaintiff—the master of his complaint—does: as a general claim for wages due. Plaintiff also takes issue with characterizing his "straight-time" wages claim as one for minimum wages.[12] But the Court cannot look at the contracts in a vacuum and ignore the fact that they offer the same rights provided by both federal and state law. Straight-time pay under the contracts is minimum wage. The Court will therefore address both claims as they are in substance—claims for unpaid minimum wages and overtime. And the findings below are limited to the situation in which a plaintiff's claims are for unpaid minimum wages and overtime. They do not extend to claims based on the timing of payment or for non-minimum-wage gap time,[13] or for other situations where the claims or the interplay of the federal and state statutes may differ.

Defendant MLOA argues that Plaintiff's claims for minimum wages and overtime are preempted by the FLSA. While that position is certainly supported within this District,[14] the Court determines that it need not even reach that question if the KWPA does not provide a cause of action for minimum wage and overtime claims.[15]

---

[12] Indeed, Plaintiff appears to be disavowing any claim for minimum wages as a loan officer; in his briefing, he specifically distinguishes cases involving claims for minimum wages. Doc. 156 at 54-55.

[13] Plaintiff mentions "gap time" in one place in his third amended complaint. Doc. 93 at 13 ¶ 97. In a document that contains 179 paragraphs, this is simply insufficient to plausibly state a claim for unpaid gap time. Moreover, because of the way that commissions were calculated, it is highly unlikely that Plaintiff intends to seek payment for these hours. Plaintiff suggests that he virtually always worked more than forty hours in a week. Gap time is, essentially and generically, that time between the hours paid and forty hours. And even if Plaintiff was not paid for some hours worked in a given week (up to forty), those hours would also not have been deducted from his commissions, as the contracts provided for. He would have therefore netted the same as if he had reported—and been paid for—all forty hours at minimum wage.

[14] District of Kansas judges have found that the FLSA does, indeed, preempt claims under the KWPA for minimum wages and overtime. *See, e.g.*, *Blair v. Transam Trucking, Inc.*, 309 F. Supp. 3d 977, 997-98 (D. Kan. 2018) (holding that Plaintiffs' class KWPA claim was duplicative of Plaintiffs' FLSA claim and therefore preempted by the FLSA); *Larson*, 2015 WL 1034334, at *3 (holding that "any attempt to bring minimum wage or overtime claims against FLSA employers through the KWPA mechanism can only be an attempt to assert the remedies found in §§ 206 and 207 of the FLSA," making "the KWPA [an improper] mechanism for asserting such claims").

[15] The Court does not need to examine preemption first, as in this situation preemption is not a jurisdictional question. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608 (6th Cir. 2004) (explaining that preemption "does not normally concern the subject-matter jurisdiction of a court to hear a claim"); *see also Devon Energy Prod. Co.,*

In Kansas, the statutory authority for minimum wage and overtime actions is not the KWPA. These actions are to be brought under the provisions of the KMWMHL. And the KMWMHL does not provide a cause of action against employers who are covered by the FLSA. For these reasons, judges in the District of Kansas have found that the KWPA—as the broader, more general statute—does not provide a cause of action at all for minimum wage and overtime claims.[16] *See, e.g.*, *Blair*, 309 F. Supp. 3d at 986 ("Based on the existing case law, and the evident purposes of the KWPA, the Court joins the majority of this District and concludes that minimum wages are not recoverable under the KWPA."); *McGowan v. Genesis Health Clubs*, 2018 WL 572052, at *5 (D. Kan. 2018) ("[T]he court concludes that Plaintiff's KWPA claim for overtime violations fails to state a plausible claim for relief because Kansas law precludes state statutory claims to recover overtime wages against FLSA-covered employers, like defendant."); *Garcia*, 766 F. Supp. 2d at 1186 n.15 (noting that employers "who are covered by the FLSA are expressly exempted from Kansas' overtime statute [the KMWMHL]," so "permitting plaintiffs to recover overtime wages from [the defendant] under the KWPA is incompatible with the exemption provision of the KMWMHL and would undermine the integrity of Kansas' wage and hour statutory scheme as a whole."); *Wheaton v. Hinz JJ, LLC*, 2014 WL 5311310, at *1-2 (D. Kan. 2014) (dismissing the plaintiff's minimum wage KWPA claim because Kansas law allows a

---

*L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203 n.4 (10th Cir. 2012) (noting that "ordinary preemption" is an affirmative defense); *DIRECTV, Inc. v. Barrett*, 311 F. Supp. 2d 1143, 1147 (D. Kan. 2004) (collecting cases holding that preemption is an avoidance or affirmative defense that must be pleaded). But the preemption question also need not be avoided as an unnecessary constitutional inquiry. Even though federal preemption is based on the Constitution's Supremacy Clause, it involves statutory interpretation instead of constitutional inquiries. *Colo. Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States*, 693 F.3d 1214, 1222 (10th Cir. 2012) ("While it is true that federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, the Supreme Court has treated preemption 'as "statutory" for purposes of [the Court's] practice of deciding statutory claims first to avoid unnecessary constitutional adjudications.'") (citations omitted).

[16] Defendant MLOA cites many of the cases referenced here and makes the same arguments, but under the rubric of a preemption argument. The Court finds the rationale persuasive but finds the more immediate question to be whether the KWPA provides a cause of action under these circumstances at all.

plaintiff to use the KMWMHL alone for minimum wage violations, and that Act exempts FLSA-covered employers like the defendant); *Spears v. Mid-America Waffles, Inc.*, 2011 WL 6304126, at *4-5 (D. Kan. 2011) (denying the plaintiffs leave to amend their complaint to add a KWPA claim based on minimum wage violations based on futility; the KMWMHL expressly exempts FLSA-covered employers).[17]

Notably, three District of Kansas cases have found otherwise. *See, e.g.*, *Rukavitsyn v. Sokolov Dental Labs., Inc.*, 2012 WL 3066578, at *6 (D. Kan. 2012) (allowing a KWPA claim based on FLSA overtime violations); *Tarcha v. Rockhurst Univ. Continuing Educ. Ctr., Inc.*, 2012 WL 1998782, at *3 (D. Kan. 2012) (noting that "[t]o the extent that plaintiffs' claims under the FLSA and KWPA are redundant, plaintiffs will be required to elect their remedies at some point later in this litigation."); *Veale v. Sprint Corp.*, 1997 WL 49114, at *2-3 (D. Kan. 1997) (rejecting the argument that a plaintiff cannot bring an action under the KWPA for overtime). This Court, however, agrees with the first approach. *See Blair*, 309 F. Supp. 3d at 990-91 (thoroughly explaining disagreement with *Rukavitsyn*, *Tarcha*, and *Veale*). Simply put, the Kansas legislature has created a specific law addressing minimum wages and overtime—the KMWMHL. And that law does not apply when the FLSA does. The KWPA, on the other hand, does not create substantive rights. It would undermine the Kansas legislature's statutory scheme to allow plaintiffs to bypass this scheme and pursue unpaid minimum wages and overtime through the KWPA.

Because Plaintiff has no cause of action under the KWPA, the Court need not address Plaintiff's argument—aimed to avoid preemption—that the longer statute of limitations in Kansas creates more rights than those offered by the FLSA.[18] Further, although the parties spend much

---

[17]  The Court recognizes that these cases are not based on contracts like the instant case. But, as explained above, the contracts in this case are coterminous with the FLSA. The same logic therefore applies.

[18]  In a previous decision in this case, Judge Murguia rejected Defendant MLOA's preemption argument, holding that Plaintiff's breach of contract claims based on overtime could proceed because Plaintiff was "entitled to seek to

time debating whether Defendant MLOA had procedures for reporting overtime and whether reporting overtime was actually a viable option,[19] the Court need not reach those issues. Because Defendant MLOA is covered by the FLSA, that federal statute is Plaintiff's sole option for attempting to collect minimum wage and overtime pay based on a statute. There simply is not a Kansas statutory option under these circumstances.

### 3. Count IV: Claim for Improper Wage Deductions while both a Loan Officer and a Team Lead

Under the KWPA, "no employer may withhold, deduct or divert any portion of an employee's wages" except in limited circumstances. K.S.A. § 44-319(a). Plaintiff believes that Defendant MLOA violated this provision because: "(1) MLOA admits it deducted uncollected credit report fees, uncollected appraisal fees and appraisal penalties from Plaintiff Charbonneau's earned wages; and (2) MLOA admits the benefit of these deductions flowed to MLOA." Doc. 156 at 38.

To be payable under the KWPA, "wages" must be those to which an employee has gained an "absolute right." *Core Cashless, LLC v. Kan. Dep't of Labor*, 2018 WL 3321173, at *10 (Kan. Ct. App. 2018) (citing *Yuille v. Pester Mkt'g Co.*, 682 P.2d 676, 680-81 (Kan. Ct. App. 1984)). Whether an employee has an absolute right to wages is "determined by the 'employment contract

---

recover additional unpaid overtime wages to the extent the statute of limitations exceeds the FLSA limitations period." *Charbonneau v. Mortg. Lenders of Am., LLC*, 2018 WL 6411447, at *2 (D. Kan. 2018) (citing *Hammond v. Lowe's Home Ctrs., Inc.*, 316 F. Supp. 2d 975, 979 (D. Kan. 2004); *McFarland v. Stratford Commons Rehab. & Health Care Ctr., LLC.*, 2017 WL 4776960, at *2 (D. Kan. 2017)). The Court declines to adopt or reject this reasoning because it does not address preemption here. But it merits noting that if the FLSA preempts state law claims where the state law claim would undermine the statutory scheme of the FLSA, then it seems that allowing a longer statute of limitations to govern state law claims that are the same as claims under the FLSA would likewise undermine the federal scheme. *Cf., e.g.*, *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007) (not addressing the statute of limitations but holding that "Congress prescribed exclusive remedies in the FLSA for violations of its mandates").

[19] As noted above, Plaintiff began this debate in his discussion of his breach of contract claim. Defendant MLOA responded in the context of both contract and KWPA claims. Because the KWPA unpaid wages claim depends upon an underlying breach of contract, it is relevant in the KWPA discussion, as well.

and employer policies.'" *Blair*, 309 F. Supp. 3d at 986 (citing *Dillard Dep't Stores, Inc. v. State Dep't of Human Res.*, 13 P.3d 358, 362 (Kan. Ct. App. 2000)).

With this guidance in mind, the Court looks to the plain language of the contracts in this case. Plaintiff's first loan officer agreement—at least as provided to the Court—did not address when commissions were earned.[20] But the "Commissions Condition" section in the loan officer compensation schedule to Plaintiff's 2016 agreement provided, "Commission Compensation is not earned until all deductions are made for Hourly Wage, shortages for uncollected fees, and uncollected costs for credit reports, pursuant to the formula for calculating commissions." Doc. 145-5 at 4 (emphasis added). This same provision appeared in Plaintiff's employment contract that governed while he was a team lead. Doc. 145-7 at 5. Plaintiff claims that Defendant MLOA did not actually calculate earned commissions in accordance with these provisions. But, boiled down, Plaintiff's complaint is simply with the order in which Defendant MLOA did the math. Notably, Plaintiff asserts no right to these amounts under his contracts.

The Court finds Plaintiff's evidence does not create a genuine issue of material fact as to whether the wages were earned before the fees were deducted. The plain language of the contracts establishes when the commissions are considered "earned." Against this plain language, Plaintiff offers two legal conclusions (in the form of his own affidavit and Mr. Kneibert's testimony, which was given over objection as to the legal terminology of "wages") and a paystub, which reveals a tax issue but no helpful information on what constitutes earned wages under the contract. This evidence neither creates an ambiguity nor a triable issue.

---

[20] Any claim based on the first contract, however, lacks support because Plaintiff did not identify evidence in the record demonstrating that any deductions were made while he was a loan officer the first time, between February 2013 and August 2013.

The contractual provisions titled "Commissions Condition" create permissible conditions precedent to Plaintiff's earning of wages. *See Weir v. Anaconda Co.*, 773 F.2d 1073, 1084 (10th Cir. 1985); *Weinzirl v. Wells Grp., Inc.*, 677 P.2d 1004, 1008 (Kan. 1984). Until deductions were made from Plaintiff's commissions for his hourly wages, uncollected fees, and credit report costs, Plaintiff's wages were not earned under the plain language of the contracts. Defendant MLOA's commission calculation and payments pursuant to that calculation, therefore, did not violate the KWPA. *See, e.g.*, *Dressler v. Kan. Copters & Wings, Inc.*, 2010 WL 3168358, at *8 (D. Kan. 2010); *Dangerfield v. Montgomery Ward Co.*, 694 P.2d 439, 440 (Kan. 1985).

### C.    Count V: Claim for Unjust Enrichment/Quantum Meruit

Plaintiff voluntarily dismissed this claim in his response to Defendants' summary judgment motion. The Court therefore considers it dismissed and declines to discuss it further.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion for Partial Summary Judgment (Doc. 144) is GRANTED. Defendants are granted summary judgment on Counts III, IV, VI, and VII. Count V is DISMISSED WITHOUT PREJUDICE. This decision renders Plaintiff's pending motion for class certification (Doc. 133) moot. Without valid underlying state law claims, the Court cannot certify a class. The Court therefore orders that Plaintiff's motion for class certification (Doc. 133) is DENIED as MOOT and WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: June 30, 2020                                    /s/  *Holly L. Teeter*
                                                        HOLLY L. TEETER
                                                        UNITED STATES DISTRICT JUDGE