IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BEAU CHARBONNEAU, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

MORTGAGE LENDERS OF AMERICA
L.L.C., et al.,

      Defendants.

Case No. 2:18-cv-02062-HLT-ADM

## MEMORANDUM AND ORDER

Plaintiff Beau Charbonneau brings this putative collective action, on behalf of himself and all others similarly situated ("Plaintiffs"), under the Fair Labor Standards Act ("FLSA") against Defendants Mortgage Lenders of America, L.L.C. ("MLOA"), Philip Kneibert, and Bradley Ives. The Court conditionally certified two separate FLSA classes ("Team Leads" and "Loan Officers") on December 6, 2018. Doc. 45. Defendants now move to decertify Plaintiffs' FLSA claims. Doc. 188. For the reasons explained below, Defendants' motion is denied.

**I.  BACKGROUND**

Defendant MLOA[1] is a mortgage-lending company that employs over 300 lending professionals at its sole office in Overland Park, Kansas. MLOA's lending professionals sell mortgage loans over the phone and internet. MLOA's lending professionals include Loan Officers, Team Leads, and Directors. MLOA assigned its Loan Officers to different "teams," and each team had a Team Lead who reported to one of three "Directors," each of whom oversaw one of three

---

[1]  Defendant MLOA is currently known as Zillow Home Loans, LLC. In 2018, Zillow Group, Inc. acquired MLOA and, in connection with the acquisition, changed the corporate name of MLOA to Zillow Home Loans, LLC ("Zillow").

divisions. MLOA's three Directors were Brian Kirk, Lisa Rockers-Nelson, and Brian Arnoldy. The Directors reported directly to Defendants Kneibert and Ives.

MLOA employed Beau Charbonneau, the named plaintiff in this lawsuit, as a Loan Officer from January 2013-August 2013, and from August 2016-November 2017, and as a Team Lead from August 2013-August 2016. On December 6, 2018, the Court granted Plaintiff Charbonneau's motion for conditional certification of class claims under the relevant FLSA provision, 29 U.S.C. § 216(b). Specifically, the Court conditionally certified the following classes of employees:

> (1)     All persons who are, have been, or will be employed by Defendants as "Team Leads," "Team Leaders," and other individuals with similar job titles within the United States at any time during the last three years through the entry of judgment in this case ("FLSA Team Lead Collective"); and
>
> (2)     All persons who are, have been, or will be employed by Defendants as "Loan Officers," "Mortgage Loan Officers," "Entry Level Loan Officers," and other individuals who originated loan products with similar job titles within the United States at any time during the last three years through the entry of judgment in this case ("FLSA Loan Officer Collective").

Doc. 45 at 5.

In granting Plaintiff Charbonneau's motion, the Court authorized him to send a Court-approved notice to others employed as Team Leads and Loan Officers during the previous three years. In total, 171 individuals filed consents to join this action. Four Plaintiffs voluntarily withdrew, leaving 167 Plaintiffs.

**A.     Loan Officers**

MLOA classified all Loan Officers as non-exempt employees subject to the FLSA's overtime requirements. Loan Officers' compensation structure was set forth in standardized, written agreements. Loan Officers were expected to work "a minimum of 40 hours per week." Doc. 192-8 at 1-2. MLOA utilized uniform job descriptions for Loan Officers and their job

2

requirements included "originating mortgage loans" and "conducting borrower interviews," as well as the following required tasks:

- Following up on lead submissions and recording activity into contact management system;
- Processing inbound and outbound calls through company phone system;
- Educating borrowers on the loan process and assisting them in identifying the appropriate loan;
- Collecting borrower financial/credit information;
- Processing borrower credit/income information;
- Presenting loan options for borrowers including rates and fees for loans;
- Securing proper documentation and managing loan progress through the processing/closing; and
- Maintaining in-depth knowledge of loan programs including; FHA, VA, USDA, and Conventional loan programs.

Doc. 192-10.

MLOA has physical time clocks in its office for Loan Officers to report their time worked in the office. The time clocks require a password and biometric hand scan for employees to clock in and out. Thus, the time clocks only record work hours performed in MLOA's physical office. However, Plaintiffs contend that Loan Officers regularly performed off-the-clock work on their cell phones and email while out of the office. This off-the-clock work included tasks that could be performed without logging into MLOA's computer system, such as communicating with leads, borrowers, realtors, appraisers, and MLOA management, as well as obtaining loan documents and coordinating the loan process and closings.

Plaintiffs contend that MLOA encouraged such off-the-clock work. In a company-wide email sent on January 13, 2016, and again on September 27, 2017, Defendant Kneibert sent a "friendly reminder regarding various policies related to life at MLOA." He stated that the "LO should be available when his/her file is closing," and if they are "not going to be in the office when a file closes," they should notify the closer and their Team Lead. He then reminded employees that

3

they are required to clock out if they are leaving the building. And he also encouraged employees to forward their office phone to their cell phone, noting that this "is especially important for our LOs" as "[m]any LOs have captured deals by having phones forwarded during the weekend." Doc. 192-36 at 2, 5. MLOA also directed Loan Officers to include their cell phone number on their MLOA email signature and business cards so customers and other parties involved in the loan process could contact them when they were not in office. MLOA similarly directed Loan Officers to have their work email set up on their cell phones so they could communicate while out of the office.

MLOA's Loan Officer Agreement stated that Loan Officers were required to obtain written permission in advance before overtime work is performed, and that unauthorized overtime work could result in disciplinary action. The Agreement further provided:

> Officer is required to use the MLOA time clock system to record Officer's hours worked. Officer shall notify Officer's [Team Lead] as soon as possible, if Officer misses or incorrectly records an entry into the timekeeping system. In that case, MLOA has the right to adjust the time clock record to accurately report the time Officer worked.

Doc. 189-7 at § 5.3.

Until 2017, if a Loan Officer missed a time clock punch, they were expected to contact their Team Lead to request corrections. After 2017, MLOA centralized the time-record-correction process with Human Resources by creating a "time-card corrections" email account. During discovery, MLOA produced approximately 1,500 emails that had been sent to the time-card corrections email account. During her deposition, MLOA's HR Director testified that she could not recall receiving any email or notification from any Loan Officer asking that time be added to their timecard for work performed out of the office on their cell phone. She also testified that she was not aware of any emails sent to the time-card corrections email account that had "to do with

an employee making a request to have time added to their timecard for work they performed on their cellphone out of the office." She further testified that MLOA never "provided any training to loan officers concerning how or under what circumstances loan officers could or were allowed to report time worked on their cell phones out of the office" because "[w]e did not train our officers on things that we didn't want them to do." Doc. 192-28 at 14, 22.

Loan Officers were required to review and approve their time sheets for accuracy each pay period. However, the review was limited to in-office, clocked hours and related time-punch errors on MLOA's physical time clocks. During discovery, MLOA did not identify a single Loan Officer whom it allowed to report and be paid for work performed outside the office before Zillow's acquisition. On the other hand, 130 Plaintiffs testified or submitted declarations stating that MLOA did not allow Loan Officers to report time spent working out of the office on cell phones and email, and that MLOA did not have a policy or mechanism in place for employees to report such time worked. Plaintiffs Charbonneau, Hoge, Lewis, and Bernard specifically testified that MLOA rejected requests to have time for such work added.

**B.     Team Leads**

Defendants MLOA, Kneibert, and Ives made the policy decision to classify its Team Leads as exempt from the FLSA's overtime requirements and did not pay them overtime compensation. On September 14, 2020, the Court granted Plaintiffs' motion for partial summary judgment on Defendants' purported FLSA exemption defenses as to Team Leads. The Court held that MLOA failed to pay the Team Leads on either a salary or fee basis, and thus the Team Leads were

misclassified as exempt until April 2019 when Zillow started paying Team Leads a guaranteed salary of $455 or more per week.[2]

Team Leads' compensation structure was set forth in standardized, written agreements. Team Leads all worked under a uniform job description that required them to perform all the duties of a Loan Officer, as well as other additional tasks, including:

- Thorough understanding and implementation of Human Resource Policies & Procedures including Payroll, Commissions, hours worked, and overtime management;
- Training [team members] on sales organizational techniques including CRM, phone systems, and other resources available to ensure success;
- Training [team members] on the loan process and providing guidance in accuracy, efficiency, productivity and compliance; and
- Pipeline management for entire team.

Doc. 192-21. In addition, Team Leads were required to provide assistance to Loan Officers and be "readily accessible to the Team to meet their needs which includes: in person, telephone, or electronic." Doc. 192-2.

Team Leads regularly worked more than 40 hours per week, including work outside of MLOA's office during evenings and weekends. Team Leads did not clock in or out from work, and MLOA did not record Team Leads' work hours. Work outside the office included tasks that could be performed by cell phone and email without logging into MLOA's computer system, such as communicating with leads, borrowers, realtors, title companies, and appraisers; assisting Loan Officers; obtaining and reviewing loan documents; and coordinating the loan process and closings. Additionally, MLOA provided Team Leads with remote VPN access to its computer system, which allowed them to work from home on a computer.

---

[2] The Court's Order disposed of all four exemption defenses raised by Defendants. *See* Doc. 186. Accordingly, the Team Leads are entitled to overtime pay for all overtime hours worked during the applicable time period.

## II.     LEGAL STANDARD

In analyzing a motion to decertify at the conclusion of discovery, the "overriding question" remains whether the named plaintiffs and the opt-in plaintiffs are "similarly situated" for purposes of 29 U.S.C. § 216(b). *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). The standard at this stage, however, is stricter than that utilized at the "notice stage," and courts are required to review several factors. These factors include: (1) any disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* at 1102–03. Whether to decertify a collective action is within the district court's discretion. *Id.* at 1102.

## III.    ANALYSIS

### A.    The Team Leads are similarly situated.

The Court first addresses Defendants' motion to decertify as it applies to the Team Lead class. Defendants initially offered no arguments specific to the Team Leads, rather they directed all arguments at the Loan Officers. However, in their Reply, Defendants argued that it is irrelevant whether the Team Leads are similarly situated because Plaintiffs cannot prove that the Team Leads are similarly situated to the Loan Officers. This warrants decertification, Defendants argue, because Plaintiffs cannot proceed on a representative basis with two plainly incongruous groups of Plaintiffs. The Court disagrees. When two classes have been conditionally certified, it is proper to analyze each class separately for decertification purposes. *See, e.g.*, *Swartz v. DJ Eng'g, Inc.*, 2015 WL 4139376, at *7 (D. Kan. 2015).

Applying the relevant factors, the Court determines that the Team Leads are indeed similarly situated. First, Defendants have not identified any disparate factual and employment

settings of the individual Team Leads. The Team Leads all had the same job titles, job descriptions, and job duties. All worked at a single office in Overland Park, Kansas, and were compensated via standard written agreements. Although MLOA did not record the time Team Leads' spent working, Plaintiffs unanimously contend they regularly worked more than 40 hours per week, including work outside of MLOA's office during evenings and weekends. And as this Court previously held, the Team Leads were all subject to the same FLSA-violating policy: misclassification. *See* Doc. 186 at 7–16. Accordingly, this factor weighs in favor of collective adjudication. *See infra* Section III.B.1.

Regarding the second factor, Defendants have not identified any defenses that appear to be individual to each Team Lead. At this stage, only damages issues remain, and the fact that Team Leads may have suffered individualized damages is not a basis for decertification. Thus, this factor also weights in favor of collective adjudication. *See infra* Section III.B.2.

And finally, fairness and procedural considerations weigh in favor of collective adjudication as well. Where Plaintiffs have already established liability and there are no individualized defenses, it would not be proper to deprive the Team Leads of the collective mechanism provided by § 216(b). *See infra* Section III.B.3.

Having concluded that each of the factors favors allowing the Team Leads' claims to proceed as a collective action, the Court denies Defendants' motion with respect to decertifying the Team Lead class.

### B.     The Loan Officers are similarly situated.

The Court next addresses Defendants' motion to decertify as it applies to the Loan Officer class. As explained below, all three factors favor allowing the Loan Officers' claims to proceed as a collective action.

### 1.     Employment Settings

The first factor looks at whether there are disparate factual and employment settings of the individual plaintiffs. When evaluating this factor, courts compare the named plaintiff to the opt-in plaintiffs, and evaluate the similarities and dissimilarities in employment responsibilities and circumstances. *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1001 (D. Kan. 2018). On this point, there is little dispute that all Loan Officers worked in the same location, had the same duties, were subject to the same timekeeping system, and were employed under identical agreements. Although they were managed by different Team Leads, the Team Leads were under the direction of only three Directors.

Defendants nevertheless argue that the Loan Officers' differing factual circumstances about actual off-the-clock work precludes collective adjudication. Generally, Defendants contend disparate evidence exists regarding whether Loan Officers were directed to work off the clock, whether they did in fact work off the clock, and whether they reported any such alleged overtime pursuant to MLOA's policies and procedures. Plaintiffs respond that the evidence overwhelmingly shows that Loan Officers were subjected to the same FLSA-violating policy that directed them to work overtime off the clock without pay. General allegations of an overarching policy are insufficient to sustain certification at this stage. Courts instead require "substantial evidence of a single decision, policy, or plan." *Id*. (internal quotation omitted). For the following reasons, the Court agrees that Plaintiffs' claims are unified by a common theory that makes them substantially similar and warrants continued certification.

First, there is evidence that MLOA directed and expected all Loan Officers to work off the clock while out of the office on their phones and email. Defendant Kneibert, MLOA's President, sent company-wide emails in 2016 and 2017 reminding employees about MLOA's policies. In

9

these emails, he instructed Loan Officers to be available when their file is closing, even if they will not be in the office when the file closes. He also encouraged employees to forward their office phone to their cell phone, noting that this "is especially important for our LOs" as "[m]any LOs have captured deals by having phones forwarded during the weekend." Doc. 192-36 at 2, 5. These emails were reviewed and approved by MLOA's HR Director, who confirmed the directives were consistent with MLOA's policies. MLOA also directed Loan Officers to include their cell phone number in their MLOA email signature and on their business cards so customers and other parties involved in the loan process could contact them when they were not in office. And MLOA similarly directed Loan Officers to have their work email set up on their cell phones to communicate while out of the office.

Defendants argue that there is differing evidence regarding what directions the Loan Officers were allegedly given about off-the-clock work. Defendants cite to the Declaration of James Griesbach and the deposition testimony of Opt-in Plaintiff David Vaughan for the proposition that some Loan Officers deny they were instructed to forward their office phones to their cell phones and/or to put their cell phone number in their email signature blocks.

But this evidence fails to establish a disparity amongst the Loan Officers that would require decertification. First, although James Griesbach was employed as a Loan Officer from 2015-2018, he is <u>not</u> an Opt-in Plaintiff in this case. When evaluating this factor, the Court compares the factual and employment settings of the named plaintiff and the opt-ins—individuals who have not opted in are not relevant to the analysis. *See Blair*, 309 F. Supp. 3d at 1001. Second, as to Plaintiff Vaughan's testimony, it is not as conclusive as Defendants suggest. In the deposition testimony cited by Defendants, Vaughan confirmed a narrow inquiry: that he did not have his cell phone number in his email signature in May 2017. But in the very next question, he confirms that he <u>did</u>

10

have his cell phone number in his email signature at other times. Doc. 189-24 at 13. This does not establish that Vaughan denied that he was instructed to put his cell phone number in his email signature blocks. In fact, Vaughan's testimony otherwise supports Plaintiffs' argument. In the same deposition, Vaughan testified that Defendant Kneibert told him that "people should take calls outside the office," and that he had confronted Defendant Kneibert numerous times "about people working outside of work that wasn't recorded" but was always told "we are to be available 24/7." *Id.* at 14; *see also* Doc. 192-26 at 8.

Defendants also argue that nearly 68% of the Loan Officers who responded to discovery denied they were instructed to work off the clock, or else "don't know," or "don't remember" if they were so instructed. This claim is in reference to an interrogatory, in which MLOA asked: "While working as a Loan Officer, do you claim any employee of Defendant directed you to work more than 40 hours in any work week and not record your time?" Doc. 192-39. On its face, this interrogatory asks about direct instructions to work "more than 40 hours" <u>and</u> "not record your time." It does not ask whether Loan Officers were directed to perform off-the-clock work in general. Moreover, Plaintiffs presented 121 sworn declarations and cited to deposition testimony from the nine Plaintiffs MLOA deposed. All 130 of these Plaintiffs contend that MLOA systematically directed or expected its Loan Officers to perform off-the-clock work outside the office. Thus, the record contains evidence of a company-wide policy under which Loan Officers were expected to work off-the-clock while out of the office on their phones and email.

<u>Second</u>, this off-the-clock work resulted in unpaid overtime hours because all Loan Officers worked more than 40 hours in at least some weeks. MLOA's Standard Loan Officer Agreement, which all Loan Officers were subject to, provided that "Officer's work hours are a

11

minimum of 40 hours per week." Doc. 192-8 at 1-2 (emphasis added). And Plaintiffs unanimously agree that they worked more than 40 hours in at least some weeks.

Defendants cite to testimony from Plaintiffs James Barber and Emily Sidwell, who testified that there were weeks they did not work 40 hours (i.e., had no unpaid overtime). In particular, Defendants contend Barber's time records indicate he clocked 40 or more hours in only 15% of his workweeks, and that he averaged approximately 33 hours per week. But this does not create dissimilarity among the Loan Officers. The fact remains that all Plaintiffs worked more than 40 hours in at least some weeks during the applicable period.

Similarly, Defendants point to Plaintiff Charbonneau's deposition testimony, wherein he testified that some Loan Officers (Jason Hicks and Dene Pelster) may have clocked less than 40 hours in some weeks. However, neither Hicks nor Pelster are Plaintiffs in this case. Even if they were, Plaintiff Charbonneau did not testify that these individuals never worked more than 40 hours per week. Accordingly, the Court is satisfied that all Loan Officer Plaintiffs worked more than 40 hours in at least some weeks.

Third, MLOA did not allow or have a mechanism for Loan Officers to report such time. MLOA's time clock only recorded Loan Officers' in-office work. While MLOA encouraged Loan Officers to work outside the office, off-the-clock, it did not provide any training on how to report and receive pay for such work. MLOA's HR Director testified that MLOA never "provided any training to loan officers concerning how or under what circumstances loan officers could or were allowed to report time worked on their cell phones out of the office" because "[w]e did not train our officers on things that we didn't want them to do." Doc. 192-28 at 14, 22.

Defendants argue that its time-card correction email address was a mechanism by which Loan Officers could report such time. However, of the approximately 1,500 emails MLOA

12

produced, MLOA was unable to identify even one instance where a Loan Officer requested time-card corrections for out-of-office work. MLOA's HR Director testified that she could not recall receiving any email or notification from any Loan Officer asking that time be added to their timecard for work performed out of the office on their cell phone. She also testified that she was not aware of any emails sent to the time-card corrections email account that "has to do with an employee making a request to have time added to their timecard for work they performed on their cellphone out of the office."

During discovery, MLOA did not identify a single Loan Officer who it allowed to report and be paid for work performed outside the office before Zillow's acquisition. On the other hand, 130 Plaintiffs testified or declared that MLOA did not allow Loan Officers to report time spent working out of the office on cell phones and email, and that MLOA did not have a policy or mechanism in place for employees to report such time worked. Accordingly, the record contains sufficient evidence that MLOA did not allow or have a mechanism for Loan Officers to report time worked off-the-clock and out of the office.

For these reasons, the Court is satisfied that Plaintiffs' claims are unified by a common theory: that MLOA knowingly failed to pay Loan Officers for off-the-clock work it directed and expected they perform outside the office, which resulted in unpaid overtime. *See Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017). This factor therefore weighs in favor of collective treatment.

### 2. The Existence of Individualized Defenses

Defendants next argue that the presence of highly individualized defenses require decertification. Specifically, Defendants assert the following defenses require an individualized analysis: (1) whether Defendants knew or should have known about alleged off-the-clock work

13

performed by Loan Officers; (2) whether Loan Officers had knowledge of and followed MLOA's policy regarding all time worked; (3) Defendants' *de minimis* defense; (4) Defendants' waiver defense; and (5) Defendants' statute-of-limitations defense.

The Court is not convinced that these defenses require decertification. The first two defenses directly challenge Plaintiffs' theory of the case discussed above—whether Defendants directed off-the-clock work at all and whether Plaintiffs should have reported it. But, as discussed above, all Plaintiffs' claims rest on common questions of law and similar facts regarding off-the-clock work. Similarities among Plaintiffs' claims will provide Defendants "with the opportunity to present broad-based defenses to the allegations in this action, which will not require proof of individualized facts at trial." *LaFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 474 (E.D. Va. 2014). "Depositions, affidavits and representative sampling may also be used to estimate hours worked on-the-clock and off-the-clock as well as evaluate the prevalence of common practices and occurrences to establish certain defenses." *Id*.

The Court also disagrees with Defendants' assertion that they will need to call "each and every Plaintiff" at trial to defend against Plaintiffs' claims. Courts routinely allow the use of representative testimony in cases involving allegations of unpaid overtime. *See, e.g.*, *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) ("[N]ot all employees need testify in order to prove FLSA violations or recoup back-wages"); *Reich v. Gateway Press*, 13 F.3d 685, 701–02 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."). Similarly, Defendants will be allowed to raise their asserted defenses by examining representative Plaintiffs and presenting their own evidence at trial. *See Monroe*, 860 F.3d at 404 (stating that several circuits, including the Tenth Circuit, "hold that individualized

14

defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation").

The Court further finds that Defendants' waiver, statute of limitations, and *de minimis* defenses are not individualized defenses requiring separate trials. *See Thiessen*, 267 F.3d at 1104–08 (concluding that district court abused its discretion in decertifying the class because defendants' "highly individualized" defenses could be dealt with at the damages stage of trial). The only information necessary to resolve the waiver argument is located in identical WH-58 forms issued to the 80 Plaintiffs who received backpay awards in the DOL-approved settlement for unpaid meal breaks. To the extent the Court is asked to and ultimately finds that any Plaintiffs have waived relief, those Plaintiffs can easily be divided out. *See Kaiser v. At The Beach, Inc.*, 2010 WL 5114729, at *7 (N.D. Okla. 2010) ("[T]he Court can easily divide Plaintiffs into three groups and render relevant legal rulings on the § 216(c) waiver defense, indicating that this defense also does not warrant decertification.").

Similarly, the statute of limitations period varies for each Opt-in Plaintiff based on the date each opt-in consent is filed in every FLSA collective action.[3] Whether tolling is warranted, as Plaintiffs contend it is, can easily be resolved with one trial motion. To the extent this defense may require some individualized inquiry, it does not warrant decertification. *See Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 617 (D. Kan. 2014) (concluding that, even though the statute of limitations defense "requires some individualized inquiries," that "does not mean that individual issues predominate over common issues").

---

[3] The Pretrial Order indicates that Plaintiffs intend to file a motion to equitably toll the statute of limitations applicable to all post-certification Opt-in Plaintiffs' claims from the date of the Court's conditional certification order. Doc. 185 at 20. To date, such a motion has not been filed and the Court has not ruled on the issue.

And with respect to Defendants' *de minimis* defense, Defendants contend the specific amount of time each Plaintiff spent performing off-the-clock tasks of a *de minimis* nature will vary from Plaintiff to Plaintiff. While that may be true, Defendant will not be required or permitted to establish the exact amount of time each Plaintiff spent on *de minimis* tasks. *See McDonald v. Kellogg Co.*, 2011 WL 6372870, at *4 (D. Kan. 2011). Defendants can also establish this defense through examination of representative Plaintiffs on the issue.

Therefore, this factor weighs also in favor of collective treatment.

### 3.     Fairness and Procedural Considerations

The third factor, the degree of fairness and the procedural impact of decertifying the case, weighs in favor of collective treatment too. "[T]he primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Underwood v. NMC Mortg. Corp.*, 2009 WL 1322588, at *4 (D. Kan. 2009).

Defendants contend that collective adjudication would infringe on Defendants' right to defend against the asserted claims, which they cannot do in one trial because Plaintiffs are not similarly situated. However, as the Court held above, Defendants will be allowed to raise all their asserted defenses by examining representative Plaintiffs and presenting their own evidence at trial. And because Plaintiffs allege a common, FLSA-violating policy, "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Furthermore, collective adjudication satisfies the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small,

16

related claims for which proceeding individually would be too costly to be practical. *Monroe*, 860 F.3d at 405.

Thus, all three factors lead the Court to conclude that the Loan Officer Plaintiffs are similarly situated.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion to Decertify Plaintiffs' FLSA claims (Doc. 188) is DENIED.

IT IS SO ORDERED.

Dated: January 11, 2021  /s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE